## FARGO v. POWERS et al.

### (District Court, E. D. Michigan. September 23, 1914.)

### No. 3844.

**1. CONSTITUTIONAL LAW ⊙➾12—CONSTRUCTION OF CONSTITUTIONAL PROVISIONS—EXTRINSIC MATTERS—HISTORY OF THE TIMES.**

The interpretation of constitutional provisions is to be made in view of the history of the times, the evil to be remedied, and the purpose to be accomplished.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 9; Dec. Dig. ⊙➾12.]

**2. TAXATION ⊙➾142—CONSTRUCTION OF CONSTITUTIONAL PROVISIONS—"CORPORATIONS."**

The word "corporation," as used in Const. Mich. art. 14, § 10 (amendment of 1900), which authorizes the Legislature to "provide for the assessment of the property of corporations at its true cash value by a state board of assessors," in view of the previous legislation of the state in which express companies were classed for purposes of taxation with railroad, telegraph, and similar companies, of the course of judicial decision and the agitation and other facts disclosed by the history of the times, which resulted in the adoption of the amendment, the purpose of which was to place the taxation of such companies on an ad valorem instead of a specific basis, includes an express company which, although not strictly a corporation but a joint-stock association, has many of the attributes and powers of a corporation under the laws of the state of its organization.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 270; Dec. Dig. ⊙➾142.

For other definitions, see Words and Phrases, First and Second Series, Corporation.]

**3. CONSTITUTIONAL LAW ⊙➾20—CONSTRUCTION OF CONSTITUTIONAL PROVISIONS—LEGISLATIVE CONSTRUCTION.**

If a state constitutional provision is susceptible of two constructions, the action of the Legislature in adopting one of those constructions and enacting a statute to carry it into effect as thus construed is conclusive in favor of such construction.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 14, 15; Dec. Dig. ⊙➾20.]

**4. TAXATION ⊙➾388—MODE OF ASSESSMENT—PROPERTY OF EXPRESS COMPANY.**

That a state board in the assessment of the property of an express company included its tangible personal property in other states used in conducting its business in making up the entire value of its property as a unit, the portion assessable in the state then being determined on a mileage basis, does not invalidate the assessment; nor does the fact that the board refused to include in the aggregate mileage of the company its claimed foreign and ocean mileage, where the record indicated that the character of such mileage was at least equivocal and that the company did not have the ocean routes claimed under contracts, but in some cases merely contracts for rates with no exclusive rights, and in others not even those.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 667, 668; Dec. Dig. ⊙➾388.]

In Equity. Suit by James C. Fargo, president of the American Express Company, against Perry F. Powers (Bradley substituted), Auditor General of the State of Michigan, and others. Decree for defendants.

⊙➾For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Campbell, Bulkley & Ledyard, of Detroit, Mich., for complainant.
Roger I. Wykes, of Grand Rapids, Mich., for defendants.

TUTTLE, District Judge. This case involves the authority of
the State Board of Assessors, and the method of its exercise, in as-
sessing the property of express companies in Michigan.

The American Express Company, in 1903 and previously, did busi-
ness and operated routes and possessed property in Michigan, which
was in 1903 subject to taxation in this state; the State Board of As-
sessors imposed a tax for 1903 upon its Michigan property.

The statute under which taxation of the express company's prop-
erty took place was Act 173 of 1901, as amended by Act 45 of 1903.

The bill is filed by James C. Fargo, on behalf of the said express
company, to question the validity of the statute and tax and to re-
strain the collection of this tax.

These acts were based upon, and purposed to carry into effect, the
constitutional amendments of 1900 embraced in sections 10 and 11
of article 14 of the Constitution, which reads as follows:

"Sec. 10. The state may continue to collect all specific taxes accruing to
the treasury under existing laws. The Legislature may provide for the col-
lection of specific taxes from corporations. The Legislature may provide
for the assessment of the property of corporations, at its true cash value, by
a State Board of Assessors and for the levying and collection of taxes there-
on. All taxes hereafter levied on the property of such classes of corporations
as are paying specific taxes under laws in force on November 6th, A. D. nine-
teen hundred, shall be applied as provided for specific state taxes in section
one of this article.

"Sec. 11. The Legislature shall provide a uniform rule of taxation except
on property paying specific taxes, and taxes shall be levied on such property
as shall be prescribed by law: Provided, that the Legislature shall provide an
uniform rule of taxation for such property as shall be assessed by a State
Board of Assessors, and the rate of taxation on such property shall be the
rate which the State Board of Assessors shall ascertain and determine is
the average rate levied upon other property upon which ad valorem taxes
are assessed for state, county, township, school and municipal purposes."

This system of taxation required detailed reports from all express
companies, owning property and doing business in Michigan. The
required report was made by the American Express Company for
1903.

After the coming in of the report, the board assessed the property
of the company in Michigan, and extended the taxes against the as-
sessment at the average rate as fixed by law.

Under the statute (section 8, Act 45 of 1903) the method of fixing
the value of the Michigan property of express companies was as fol-
lows:

"In determining the cash value of the property of express companies, they
shall ascertain and determine the actual value in money of the entire amount
of the capital stock and bonded indebtedness of such express company. From
the amount so obtained and determined, said board shall deduct the actual
value of all real estate owned by it as ascertained by said board, and the
actual value of all its personal property which is not used in the express busi-
ness of such express company. And the remainder thus obtained shall be
used in determining the assessment of such express company in the following
manner: The said board shall then divide the amount obtained above by

the total number of miles of railroad, stage, water and other routes over which the company did business, to obtain the value per mile, and shall then multiply the value per mile thus obtained by the total number of miles of such routes within this state, exclusive, however, of the number of miles of water routes over the navigable waters of the United States within this state, to which results shall be added the value of all real estate owned by such express company in this state, as determined by said board, and the sum so obtained shall be taken and considered as the actual value of the property of such express company subject to assessment and taxation in this state."

In its report for the year 1903, the express company stated, as the value of its several items of property and its mileage, the following:

Number of shares, 180,000; par value $100; actual value $153; personal property, not used in the express business, $20,939,694.22; real estate in Michigan $43,945.74; real estate outside of Michigan, $4,897,922; mileage, railroad, stage and water in the United States and Canada $42,807.50; Michigan mileage, $5,144.38; ocean and European mileage, $125,673.

With this report before it, the board proceeded in the following manner in making its assessment:

| | | |
|---|---:|---:|
| Taking the June average of the stock sales would make the value of the single shares $193,456, and the value of 180,000 shares............................................... | | $34,822,080.00 |
| From this to be deducted: Personal property not used in the business ..................................... | $20,939,694.22 | |
| Real estate in Michigan........................ | 43,945.74 | |
| Real estate outside of Michigan................ | 4,897,922.00 | |
| Total deductions........................................ | | 25,881,561.96 |
| Leaving a balance of.................................... | | $ 8,940,518.04 |

This to be apportioned under mileage as follows:

| | |
|---|---:|
| Railroad and stage in the United States........................ | $38,828.31 |
| Water (inland)............................................... | 2,549.00 |
| Railroad in Canada.......................................... | 1,430.19 |
| Total .................................................. | $42,807.50 |

And taking the Michigan mileage as follows:

| | |
|---|---:|
| Railroad .................................................. | $4,899.38 |
| Water (inland)............................................. | 245.00 |
| Total .................................................. | $5,144.38 |

The proportion of the property to be attributed to Michigan is found by dividing 5,144.38 by 42,807.50—.1201747.

| | |
|---|---:|
| And this, applied to the value above found of $8,940,518.04, would equal............................................... | $1,074,424.07 |
| Adding the real estate in Michigan........................... | 43,945.74 |
| Brings a total value of.................................... | $1,118,369.81 |
| While the assessment was................................. | $1,120,000.00 |

The American Express Company is not, strictly speaking, a corporation, but is a joint-stock association, organized under voluntary agreement of the parties pursuant to the common law of the state of New York. The Legislatures of that state have, from time to time, passed laws which confer upon joint-stock associations powers of a

more or less corporate nature, but not destroying their real character of voluntary joint-stock associations.

While the bill raised numerous objections to the validity of the statute, Act 173 of 1901, and to the method of assessment followed and the tax imposed, but three of those objections were presented and insisted upon by the complainant's solicitor in argument:

(a) That, as the American Express Company is a partnership and not a corporation, it is not within the terms of the Michigan constitutional amendment of 1900 or of the taxing statute.

(b) That the act under which the assessment is made and the method and principle of the assessment of complainant's property as made are unconstitutional and void, because said act requires the taxation of, and said assessment actually did tax in Michigan, the tangible personal property of the American Express Company used in its business and permanently located outside of the state of Michigan.

(c) That the refusal of the State Board of Assessors to use the ocean mileage or routes as a part of complainant's aggregate mileage was a violation both of the taxing statute and of the federal Constitution.

While only the more important facts are stated in this opinion, all of the facts and proof in the case have been given due and full consideration.

Upon those facts the court is constrained to, and does, hold both the taxing statute and the action of the State Board thereunder, in assessing and taxing the property of the American Express Company, to be valid and constitutional.

[2] The first objection to the tax and statute made by the complainants involves the construction to be placed upon the constitutional amendment of 1900, and the determination of whether the term "corporations" as used in that amendment extends to, and includes, the property of joint-stock associations, such as the American Express Company, in such a manner as to permit the Legislature to apply to the property of those institutions the rule of assessment and taxation provided for in Act 173 of the Public Acts of 1901.

Upon its face the constitutional amendment is limited to corporations. If the amendment is to be construed literally and to include nothing but those institutions possessing every attribute of, and which are strictly, corporations, possibly the property of the complainant could not be included in the plan of taxation enacted thereunder, as it is a joint-stock association organized under the New York laws, and is not, strictly speaking, a corporation.

The representative of the state claims that the intent of the framers of this constitutional amendment and of the people in adopting it was to include and to permit the taxation through a State Board of Assessors of the property of joint-stock associations, and particularly the property of those which, like the American Express Company, had theretofore been specifically taxed.

One of the primary rules in the construction of both constitutional and statutory provisions is that the intent, when ascertained, must govern. However, that rule does not permit the courts to make in-

vestigations for the purpose of applying constructions which will do violence to the language which has been used. If the term of language used be clear, there is, of course, no room for construction; but where the question is whether a particular word, such as the word "corporations" in this instance, shall be construed to extend to and include other institutions of a very similar nature, which possess so many of the attributes of corporations, and which have been almost uniformly, in the history of the legislation of the state, treated as corporations, and subjected to the same rules, and often included within the term "corporations," it becomes the duty of the court to have recourse to the history, purpose, and reason for the provision and the mischief to be remedied thereby, and to apply such construction as the history and purpose and intent of the provision will indicate to be proper.

An ambiguity or doubt as to the meaning of the term arises from the fact that it is not expressly stated whether these joint-stock companies are to be excluded from, or included within, the term, and that ambiguity or doubt permits recourse to the history of the times, the purpose of the enactment, and the mischief to be remedied.

Upon this point the Michigan Supreme Court, in Bay City v. State Treasurer, 23 Mich. 506, said:

"So the people supposed when the Constitution was adopted. Constitutions do not change with the varying tides of public opinion and desire; the will of the people therein recorded is the same inflexible law until changed by their own deliberative action; and it cannot be permissible to the courts that, in order to aid evasions and circumventions, they shall subject these instruments, which in the main only undertake to lay down broad general principles, to a literal and technical construction, as if they were great public enemies standing in the way of progress, and the duty of every good citizen was to get around their provisions whenever practicable, and give them a damaging thrust whenever convenient. They must construe them as the people did in their adoption, if the means of arriving at that construction are within their power. In these cases we thought we could arrive at it from the public history of the times."

In People v. Harding, 53 Mich. 485, 19 N. W. 156, the rule for the construction of constitutional provisions was stated in the following language:

"But it is urged that the clause is meaningless unless the effect is given to it for which the prosecution contends. In this we do not agree. It may have meaning and effect, though different to that the prosecution contends for. And in seeking for its real meaning we must take into consideration the times and circumstances under which the state Constitution was formed— the general spirit of the times and the prevailing sentiments among the people. Every Constitution has a history of its own which is likely to be more or less peculiar, and, unless interpreted in the light of this history, is liable to be made to express purposes which were never within the minds of the people in agreeing to it. This the court must keep in mind when called upon to interpret it; for their duty is to enforce the law which the people have made, and not some other law which the words of the Constitution may possibly be made to express."

In Endlich on Interpretation of Statutes, § 29, it is said:

"The interpreter, in order to understand the subject-matter and the scope and object of the enactment, must * * * refer to the history of the times to ascertain the reason for, and the meaning of the provisions of a

statute, and to the general state of opinion, public, judicial, and legislative, at the time of the enactment. And the unmistakable evidence of such contemporaneous circumstances of the intention of the Legislature should govern the construction of a statute whose terms are left doubtful by its language, and whose object is the correction of an abuse. For these purposes the court, in interpreting a statute, will take judicial notice of contemporaneous history, or it may consult contemporary or other authentic works or writings." Rhode Island v. Massachusetts, 12 Pet. 657, 9 L. Ed. 1233.

[1] Many other decisions of the state of Michigan and other states establish the same rule, namely, that the interpretation of constitutional provisions is to be made in view of the history of the times, the evil to be remedied, and the purpose to be accomplished.

The history and purpose of the constitutional amendment in question is clear. The amendment resulted from agitation for so-called equal taxation which had existed for a number of years. The purpose was to bring the property of corporations and other institutions, previously in part escaping its just share of taxation, within the rules permitting taxation of property upon its value by a state board; it being intended to include all property previously subjected to specific taxation. This brought within the scope of the agitation express, car-loaning, telegraph, telephone, railroad, and union station and depot companies; all having been taxed specifically.

Many things showing the purpose and intent of this constitutional amendment will be found in the Legislative Journals. In the course of the agitation resulting in the passage of the amendments the executives of the state sent to the Legislature numerous messages and proclamations, some of them convening it in session for the express purpose of considering the question of equal taxation and no other. These proclamations and messages throw a very clear light upon the designs of the amendment as applied to the property of express companies.

Not only were express companies taxed specifically previous to 1901, but the system of their taxation in Michigan from 1867 applied the same to joint-stock express companies, and to incorporated express companies. Act of 1867, C. L. 1871, p. 535, § 1619; Act of 1867, How. Stat. p. 952, § 3718; Act of 1867, C. L. 1897, p. 1656, § 5258.

In addition, the law for the enforcement of specific taxes contained from 1872 the following section, or its equivalent:

"The term 'corporation,' as used in this act shall be construed to include all associations and joint stock companies having any of the powers or privileges of corporations not possessed by individuals or partnerships." How. Stat. § 1255.

After 1896 and before the passage of the Atkinson Bill (Act 19) in 1899, at least six messages or proclamations upon the subject of the revision of the laws of the state so as to permit the taxation of property theretofore escaping taxation, through the payment of specific taxes, upon an ad valorem basis, were sent by the Executive to the Legislature. Typical passages from one of these messages are as follows:

"In my message of May 6, 1897, I called your attention to the operation of the present laws with reference to express companies, and pointed out to you that under the laws as they then existed we collected from express companies in the state, as one per cent. on gross earnings in 1895, $2,742.34,

and in 1896, $2,563.36. In the neighboring state of Indiana the property of these companies was assessed in 1895 for $1,330,676.00. Indiana had at that time, 1,336 less miles of railroad than Michigan. The business of express companies is largely dependent upon the railroads, so that it is safe to say that without excessive mileage and excessive commerce the business done in this state must be at least equal to the business done in the state of Indiana.

"If the express companies of this state had been assessed at the same amount as in Indiana, their taxes would have been in 1895, $37,258.93 instead of $2,742.34. This is computed at the average rate of taxation as fixed by the board of review for that year.

"In the neighboring state of Ohio express companies are made to yield even a larger revenue than in Indiana. The system under which they are taxed in Indiana and Ohio has been pronounced fair and just by the Supreme Court of the United States, and I earnestly recommend the adoption of the same system in this state.

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*

"Values, not earnings, should be assessed.

"There is but one rule consistent with honesty, and that is to place all the property of the state upon the same footing, and to make every one pay his share and to ask no one to pay more than his share. No one should ask the railroads, express companies, telegraph and telephone companies to do more than they insist upon others doing. We should not be satisfied with less. We should bear in mind that we are only representatives, in passing laws that affect the interests of our constituents and the interests of unborn men and women who are to come after us. Our constituents have a right to demand a substantial and bona fide effort to equalize taxes and to make every one pay his just share.

### "Distribution of Taxes.

"The taxes paid by railroad companies, express companies, telegraph and telephone companies under the present system are devoted to the primary school fund. I respectfully recommend to you that the taxes to be collected under any act which you may pass be devoted to the same purpose, and be paid direct to the school districts of the state in proportion to the number of school children. (H. J. Extra Session 1898, pp. 24, 25, 26.)

"I recommend that you authorize the appointment of a state board of five, to be nonpartisan if the Constitution permits, which shall be empowered to make a just and equitable valuation of the franchises and other property of railroad companies, express companies, telegraph and telephone companies, at their true cash value, and to ascertain the average rate of taxes paid by the other people of the state for state, county and municipal purposes, and to assess the property of these companies at that rate, the moneys collected to be paid directly to the state treasurer and by him distributed in the same manner as the moneys now collected from specific taxes. (H. J. Extra Session 1898, p. 26.)"

The Legislature of 1899 passed Act No. 19 of that session, commonly known as the "Atkinson Bill," being entitled:

"An act to provide for the assessment and levy of taxes upon the property of railroad companies, express companies, telegraph companies and telephone companies and the collection thereof, and the designation and election of a state board of assessors to make such assessment and levy."

This act, in section 9, provided:

"Any person or persons, joint-stock association or corporation, wherever organized or incorporated or wherever residing, engaged in the business of conveying to, from or through this state, or any part thereof, money, packages, gold, silver, plate, or other articles by express, not including the ordinary lines of transportation of merchandise and property in this state, shall

be deemed an express company within the meaning of this act." Art. 9, Act 19, 1899.

This act was held unconstitutional in Pingree v. Auditor General, 120 Mich. 95, 78 N. W. 1025, 44 L. R. A. 679, as violating the provision of the state Constitution requiring taxes upon property to be levied according to a uniform rule, and the constitutional amendments of 1900 were the outgrowth of this decision.

Following the decision in Pingree v. Auditor General, and before the passage of Act 173 of 1901, at least eight messages or proclamations bearing upon the subject of equal taxation were sent by the executives of the state to the Legislature, all of which set forth clearly that the purpose of the constitutional amendments was to reach the property theretofore taxed specifically and to permit the passage of a law along the lines of the Atkinson Bill, which had included the property of express companies whether joint-stock associations or corporations.

In his message to the special session of December, 1899, the Governor said:

"The platform of the Republican party of 1898, to which nearly all of you owe allegiance, declared as follows: 'We commend the present administration for its earnest efforts in favor of the equal and just taxation of the property of railroad, telegraph, telephone and express companies. We favor the immediate repeal of the tax upon the gross earnings of railroad companies and favor a tax to be levied upon the true value of railroad, telegraph, telephone and express companies' property, this value to be determined by a state board. The taxes collected therefrom shall be paid into the primary school fund. We indorse the principles of the Atkinson Bill and pledge the support of the Republican party thereto.'" (H. J. Special Session 1899, p. 12.)

In his proclamation convening the Legislature in special session in October 1900, he said:

"An extraordinary condition, and one which requires the immediate application of a remedy by the Legislature, exists in this state, relative to the subject of taxation. Executive messages, commencing with Governor Bagley's in 1877, have voiced the complaints of the people concerning inequality, irregularity and injustice in taxation. They have arisen largely from the unjust discrimination in favor of certain corporate property and its owners. * * *

"The decision of the Supreme Court of this state upon the principle involved in the Atkinson Bill makes it necessary to amend the Constitution before all property can be taxed at its true value. It is therefore necessary to adopt an amendment to the Constitution so that property now paying specific taxes upon earnings can be taxed at its true cash value. This should be done not only in interest of uniformity, but of justice. It is not longer seriously denied that corporations paying specific taxes on earnings are not now and have not heretofore borne their just share of the public burdens. * * *

"I hereby call the Legislature of the state of Michigan to meet in extraordinary session on Wednesday, the tenth day of October, A. D. 1900, at 12 o'clock noon, of that day to consider the question of the submission of an amendment or amendments to the Constitution which will permit the enactment of laws that will provide for the equal taxation of all property, by an assessment of the same at its cash value and for the purpose of repealing or amending the special charters of railroads and other companies." (H. J. Oct. Special Session 1900, pp. 4, 5.)

In his message to the same session he said:

"Under our Constitution as construed by the Supreme Court of Michigan, it is practically impossible to frame a law by which property of railroad,

telegraph, telephone and express companies can be taxed upon its true value, unless we resort to local taxation." (H. J. Oct. Special Session 1900, p. 10.)

He also said:

"Some of the principal arguments against specific taxation upon earnings and in support of taxation upon actual cash value are as follows:

"(1) That the policy of taxing railroads and similar corporations by a specific tax originated when the state was new, when it was thought necessary to favor the promotion of improved methods for transportation and communication. This reason no longer exists. Specific taxation was regarded at that time as a partial exemption from taxation. It can no longer be seriously contended, however, that the richest corporation in the state should be any longer favored with these special privileges. * * *

"It has been assigned as a reason for voting against measures providing for taxation upon cash value, the fact that no valuation has been made of railroads, telegraph, telephone and express companies' property, and that therefore it could not be said with any degree of certainty that these corporations are not under the present system paying their share of taxes. * * *

"Many of the statements herein made with reference to railroads, apply with equal force to telegraph, telephone and express companies, which pay taxes upon their earnings. In the case of the latter corporations it will be found that the properties of greatest value which they possess are their franchises." (H. J. Oct. Special Session 1900, pp. 10, 13, 15.)

This October special session of 1900 framed and proposed for adoption the constitutional amendment which was subsequently adopted at the November election.

These extracts from the messages of the executives of the state are typical of passages contained in all of the messages, and indicate clearly the spirit of the times, the history of the legislation and constitutional amendment, and the purpose in view.

The Legislature of 1901 passed the law under which, as amended, the assessment involved in this case took place, which was entitled:

"An act to provide for the assessment of the property of railroad companies, union station and depot companies, express companies, * * * refrigerator car companies and fast freight line companies; and for the levy of taxes thereon by a State Board of Assessors, and for the collection of such taxes."

This act (section 5) contained the provision:

"The term company, corporation or association, wherever used in this act shall apply to and be construed as referring respectively to any railroad company, union station and depot company, express company, car-loaning company or refrigerator, or fast freight line company, and any and all other corporations subject to taxation under this act."

By section 6 of the act, express companies were required to report "the nature of the company, and under the laws of what state or country organized."

It cannot be successfully contended that the provision of the statute, which included express companies in the system of assessment by a State Board of Assessors, was intended to be limited to those express companies which were in fact corporations, because the effect of such a construction would be to include but a small part of the property of express companies under that system, inasmuch as, in volume of property and business, but about one-seventh of the total

express property in the state belonged to corporations, while six-sevenths of that property belonged to joint stock associations.

The character and names of the express companies doing business in Michigan in 1901 with the volume of their business as reported by them are as follows:

| Company | Character | Miles | Gross Receipts Michigan |
|---|---|---|---|
| Adams | Joint-Stock Co. | 459.72 | $ 33,347.18 |
| American | " " " | 4,191.00 | $370,825.81 |
| National | " " " | 780.00 | $ 76,672 63 |
| Canadian | Corporation | 57.00 | $ 14,774.16 |
| Pacific | " | 79.00 | $ 4,343.73 |
| United States | Joint-Stock Co. | 697.58 | $ 33,133.31 |
| Western | Corporation | 686 58 | $ 25,482 16 |
| Dominion | " | 2.00 | $ 699.65 |

In making the first assessment under Act 173 in 1902, and each year since, the state board has construed the statute to include, and has assessed, the property of the joint-stock express companies as well as that of the corporation express companies.

In view of the facts that the agitation for increased taxation extended to all specific paying institutions, including express companies; that the purpose of the Legislature since 1897 has been to provide a system for their taxation; that the Atkinson Bill as passed included express companies; that the purpose of the constitutional amendment of 1900 was to permit legislation along the lines of the Atkinson Bill; that immediately upon the passage of that amendment the Legislature passed a law including express companies; that all the important express companies doing business in Michigan are joint-stock associations; that any system which does not include the joint-stock associations taxes but a small portion of the express property, splitting it up between two methods of taxation, and leaving the system open to the objection, upon the validity of which I do not pass; that it is not uniform as to the class of property to which it applies; that the state board has uniformly construed the act as including the joint-stock associations, and has uniformly assessed them under it; and that those associations have for the most part paid their taxes under the act—I have reached the conclusion that the purpose and effect of the constitutional amendment was to include joint-stock associations.

The American Express Company is shown by the proof to be a voluntary joint-stock association, organized under the common law of New York, and being the successor of the Merchants' Union Express Company. Its articles and the testimony show that it possesses practically all of the attributes of a corporation. Its status under the New York law is not, strictly speaking, that of a simple partnership.

In the case of Waterbury v. Merchants' Union Express Co., 50 Barb. (N. Y.) 158, 159–161, the attributes of a joint-stock association organized under the New York laws were set forth in the following language:

"Before proceeding to more particular questions, it will be useful to consider briefly the nature and legal character of these joint-stock associations. They are organized, not as simple partnerships, but with written articles of association framed under and with reference to the statute laws on the subject. The first act was passed in the year 1849. It was amended in the year 1851, and again in 1854. A further act, passed at the session of 1867, authorized these companies to hold real estate in perpetual succession. By an examination of all these statutes it will be found that joint-stock companies possess the following qualities or attributes of corporation: (1) They can, like corporations, sue or be sued in a single or collective name, to wit, the name of their president or treasurer. (2) Their property or capital is represented in shares and certificates of stock differing in no respect from the shares and stock certificates in corporations. (3) The death of a member, his insolvency, or the sale or transfer of his interest, is not a dissolution of the company. (4) They have perpetual succession, or what is sometimes called the immortality of corporations. (5) They can take and hold real and personal estate in a collective capacity and in perpetual succession. These are all attributes of a corporation, and, if we look into the books for elementary definitions, we shall find that corporations have no other attributes except the technical one of a common seal to distinguish them from common-law partnerships. On the other hand, simple partnerships have none of the attributes or qualities here mentioned. Mere names are but of little importance. Looking at the substance and nature of things, it is plain that, in respect to the absence of a common seal merely, these joint-stock associations are like partnerships. In the other and vastly more material respects mentioned, they are like corporations, although they are not declared to be such by the legislative acts referred to. And so it was in the case of the general banking act of 1838. The word 'corporation' is not used in that act, yet the institutions or associations organized under it have been uniformly held to be corporations in the fullest and most exact sense. As to personal and individual liability, I may add that this is an incident both of partnerships and corporations, uniform and invariable in the one case, subject entirely to the legislative will in the other.

"What, then, are the true relations of a shareholder in one of these associations, and by what rules and analogies are his rights to be determined where he seeks a controversy with the body to which he belongs. These institutions are of such recent origin among us, and have arisen under laws of such recent enactment, that we are without judicial precedents in this country. It seems to me, however, plain that in controversies like the present one we must follow mainly the analogies afforded by laws and jurisprudence in the case of corporations, instead of those derived from the law of simple partnership." People v. Wemple, 117 N. Y. 136, 22 N. E. 1046, 6 L. R. A. 303; Fargo v. McVicker, 55 Barb. (N. Y.) 437–440; People v. Coleman, 133 N. Y. 279, 31 N. E. 96, 16 L. R. A. 183.

In numerous cases joint-stock companies and voluntary associations have been held to be corporations, and in numerous cases laws, which in terms only included corporations, have been held to apply to joint-stock companies and to voluntary associations and to these express companies as such institutions. People v. Wemple, 117 N. Y. 136, 22 N. E. 1046, 6 L. R. A. 303; Fargo v. McVicker, 55 Barb. (N. Y.) 437, 440; Fargo v. Louisville, N. A. & Chicago Ry. Co. (C. C.) 6 Fed. 787, 790; Westcott v. Wm. G. Fargo, 61 N. Y. 542, 548, 19 Am. Rep. 300; Id., 6 Lans. 319, 329; Liverpool Ins. Co. v. Massachusetts, 10 Wall. 566, 574, 19 L. Ed. 1029; Youngstown Coke Co. v. Andrews Bros. Co. (C. C.) 79 Fed. 669; Attorney General v. Mercantile Marine Ins. Co., 121 Mass. 524; Tidewater Pipe Co. v. Assessors, 57 N. J. Law, 516, 31 Atl. 220, 27 L. R. A. 684; Pipe Line Co. v. Berry, 52 N. J. Law, 308, 19 Atl. 665; Edgeworth v. Wood, 58 N. J. Law,

463, 33 Atl. 940; Maltz et al. v. American Ex. Co., 1 Flip. 611, Fed. Cas. No. 9,002; Bushnell v. Park Bros. & Co., Ltd. (C. C.) 46 Fed. 209; Park Bros. & Co. v. Bushnell, 60 Fed. 583, 9 C. C. A. 138.

The case of Liverpool Insurance Co. v. Massachusetts, 10 Wall. 566, 19 L. Ed. 1029, indicates the reasonableness of classifying joint-stock companies with corporations for taxation purposes. This case involved an English joint-stock company. The Massachusetts court held it to be within the intent of its statute for the taxation of corporations, and that decision was sustained by the federal Supreme Court on the ground that it possessed practically all of the attributes of a corporation.

In Michigan these joint-stock associations have in numerous instances been recognized by the Constitution, the statutes, and the courts, as being properly included within the term "corporation" and as possessing practically all of the attributes of corporations, and they are subjected by express provision to all of the requirements and restrictions of the Michigan Constitution contained in the article relating to corporations. Section 11, art. 15, Michigan Constitution 1850; Act 53 of 1871 (section 5262, C. L. 1897); Act 57 of 1852 (section 1255, How. Stat.); Attorney General v. American Express Co., 118 Mich. 682, 77 N. W. 317.

In Attorney General v. American Express Company, 118 Mich. 682, 77 N. W. 317, the American Express Company was held to come within the terms of a court rule applying to corporations; the court saying:

"But counsel contend, further, that the power given to the circuit courts to issue mandamus rests upon Cir. Ct. Rule No. 46, which provides: 'Circuit courts shall have jurisdiction within their respective counties in all mandamus proceedings involving the action of any officer or board of any county, township, city, or * * * village, and the action of any private corporation or officer or board thereof,' and that, this rule not having included joint stock associations, the circuit courts are not vested with power to issue the writ. 'Corporations' and 'Associations' are convertible, and often used as synonymous, terms. There is no reason for any * * * discrimination between corporations and joint stock associations, in applying this rule. It is the intent of the rule to place all mandamus proceedings of this character primarily in the circuit courts. In reference to the assessment and collection of specific taxes, the Legislature of this state has recognized the terms as convertible. (Art. 1255, 1 How. Stat.) provides:

" 'The term corporation, as used in this act shall be construed to include all associations and joint stock companies having any of the powers or privileges of corporations not possessed by individuals or partnerships.'

"In Maltz v. American Express Co., 1 Flip. 611 [Fed. Cas. No. 9,002] it was held that, whether a corporation or not, a joint-stock association is a distinct legal entity, and that so long as that fact exists, and it possesses the attributes of perpetual succession, and the capacity of suing and being sued, it is a juridical person, and must be regarded as a citizen of the state which creates it; and it is wholly immaterial whether it be termed an 'association,' 'joint-stock association' or 'guild.' "

The foreign joint-stock association such as the American Express Company is included within the term "corporations" and subjected to the requirements applied to corporations before it is permitted to do business in Michigan by section 9 of Act 206 of 1901 as amended, and in 1907 the American Express Co. filed its articles in the office of

the Secretary of State, and paid the franchise fee in the manner required of foreign corporations.

[3] If the constitutional provisions in question are susceptible of two constructions—one being that contended for by complainants, the other that taken by the Legislature—the action of the Legislature in adopting one of those constructions and enacting a statute carrying it into effect, as thus construed, must be deemed conclusive. That rule is:

"That the acts of a state Legislature are to be presumed constitutional until the contrary is shown; and it is only when they manifestly infringe some provision of the Constitution that they can be declared void for that reason. In case of doubt, every presumption, not clearly inconsistent with the language or subject-matter, is to be made in favor of the constitutionality of the act. The power of declaring laws unconstitutional should be exercised with extreme caution and never where serious doubt exists as to the conflict."

Where a statute has been adopted in carrying into effect a constitutional provision, the constitutional provision and statute must both be so construed as to permit the act to stand. This question was passed on in People v. Blodgett, 13 Mich. 151, 161, 162, where Judge Christiancy says:

"But it has been strenuously insisted here that these principles can only properly apply when the doubt exists as to the construction of the act, and not where it arises upon the meaning of a constitutional provision; that it is in all cases the duty of the court first to fix and settle the meaning, definitely, of the Constitution, whatever may be their doubts upon it, and then to examine the act and apply it to the Constitution.

"Now, it strikes me, as a self-evident proposition, that the question whether a legislative act conflicts with the Constitution must, of necessity, equally involve the examination of both. And that, while it can make but little practical difference which is first examined and construed, the more logical order, when it is claimed that an act is unconstitutional, would be first to determine what the act is. Nor can I perceive any good ground for holding that the doubt which is to restrain us from pronouncing the act unconstitutional must be confined to the meaning of the act; nor why courts can be bound to settle, fix, and declare the meaning of the one, in spite of their doubts, more than of the other. The doubt which is to save the act is the doubt of the conflict; and this may arise alike from the construction of the one or the other, or both. In fact, it will be found that, in much the greater number of cases where the rules above cited have been laid down, the doubts arise upon the construction of the Constitution, and not upon that of the act which was claimed to conflict with it."

In Board of Education v. State Board of Assessors, 133 Mich. 120, 94 N. W. 669, the question of the construction of this constitutional provision was before the court which gave effect to the legislative construction, saying:

"But it is urged in behalf of the power exercised by the board in this case that, if the act is subject to this construction, it is in conflict with the constitutional amendment itself. In determining this question, under well-settled rules, we are not to ignore the contemporaneous construction placed upon the amendment by the Legislature itself." Kennedy v. Gies, 25 Mich. 92; Pfeiffer v. Board of Education, 118 Mich. 564, 77 N. W. 250, 42 L. R. A. 536.

[4] The second objection to be considered is that the tangible personal property of the American Express Company, located outside

of Michigan and used in the express business, was taxed in Michigan, thus exceeding constitutional limitations. The Michigan statute imposes a tax only upon the property of the company located in Michigan. In ascertaining the value of that property in Michigan and subject to taxation there, it treats the entire property of the company as a unit, deducts the real estate and the personal property not used in the business, from the total value of the unit, divides the remainder between Michigan and the other states upon the mileage of routes over which the company operates, and, to the Michigan proportion thus obtained, adds the real estate. This is but the giving of expression to the unit rule, for the assessment and taxation of the property of institutions doing business in a number of states, which has been repeatedly applied, and whose application has been repeatedly upheld. Western Union Tel. Co. v. Mass., 125 U. S. 530, 8 Sup. Ct. 961, 31 L. Ed. 790; Pullman's Palace Car Co. v. Pennsylvania, 141 U. S. 18, 11 Sup. Ct. 876, 35 L. Ed. 613; Maine v. Grand Trunk, 142 U. S. 217, 12 Sup. Ct. 121, 163, 35 L. Ed. 994; Pittsburg, C., C. & St. L. v. Backus, 154 U. S. 431, 14 Sup. Ct. 1114, 38 L. Ed. 1031; Western Union Tel. Co. v. Taggart, 163 U. S. 1, 16 Sup. Ct. 1054, 41 L. Ed. 49; Postal Tel. Co. v. Adams, 155 U. S. 688, 15 Sup. Ct. 268, 360, 39 L. Ed. 311; American Refrigerator Co. v. Hall, 174 U. S. 78, 19 Sup. Ct. 599, 43 L. Ed. 899; Marye v. Baltimore & Ohio, 127 U. S. 117, 8 Sup. Ct. 1037, 32 L. Ed. 94; Delaware Railroad Tax, 18 Wall. 206, 21 L. Ed. 888; Charlotte Columbus R. R. v. Gibbes, 142 U. S. 386, 12 Sup. Ct. 255, 35 L. Ed. 1051; Columbus So. Ry. v. Wright, 151 U. S. 470, 14 Sup. Ct. 396, 38 L. Ed. 238; State Railroad Tax Cases, 92 U. S. 608, 23 L. Ed. 663; New York Central v. Miller, 202 U. S. 584, 26 Sup. Ct. 714, 50 L. Ed. 1155; Wis. & Mich. v. Powers, 191 U. S. 379, 24 Sup. Ct. 107, 48 L. Ed. 229; Galveston, Harrisburg & San Antonio v. Texas, 210 U. S. 217, 28 Sup. Ct. 638, 52 L. Ed. 1031.

The complainant's counsel, as he must of necessity do, admits the propriety of the unit rule in general, but seeks to distinguish this case because of the fact that the property of express companies differs from that of railroad or telegraph companies and similar properties, in that, in those cases there is a physical unity or connection which does not exist with regard to the property of express companies, as the tangible property of express companies is made up of items such as horses, wagons, safes, etc., which, taken separately and by themselves, are of no greater value, and should be treated no differently, than the same items of property belonging to other persons. I find myself unable to accede to the merits of the distinction claimed. While a unity through physical connection does not exist in the property of express companies, there does exist a unity of use, and a unity through the joining together of the several items of property by means of the contracts for routes.

This unit system of valuation has been sustained, as applied to express property, and the point upon which it is here attacked falls directly within the previously decided cases. Adams Express Co. v. Ohio, 165 U. S. 194, 220, 17 Sup. Ct. 305, 41 L. Ed. 683; American Express Co. v. Indiana, 165 U. S. 255, 17 Sup. Ct. 991, 41 L. Ed.

707; Adams Express Co. v. Ohio, 166 U. S. 185, 17 Sup. Ct. 604, 41 L. Ed. 965; Adams Express Co. v. Kentucky, 166 U. S. 171, 17 Sup. Ct. 527, 41 L. Ed. 960; Fargo v. Hart, 193 U. S. 490, 24 Sup. Ct. 498, 48 L. Ed. 761; Sanford v. Poe, 69 Fed. 546, 16 C. C. A. 305, 60 L. R. A. 641; Coulter v. Weir, 127 Fed. 897, 62 C. C. A. 429.

In Adams Express Co. v. Ohio, 165 U. S. 219, 17 Sup. Ct. 309, 41 L. Ed. 683, in passing upon the two objections, that the effect of such a system is to subject to taxation property located outside the jurisdiction of the taxing state, and to impose a tax upon interstate commerce, the court said:

"As to railroad, telegraph, and sleeping car companies, engaged in interstate commerce, it has often been held by this court that their property, in the several states through which their lines or business extended, might be valued as a unit for the purpose of taxation, taking into consideration the uses to which it was put and all the elements making up aggregate value, and that a proportion of the whole fairly and properly ascertained might be taxed by the particular state without violating any federal restriction. Western Union Telegraph Co. v. Massachusetts, 125 U. S. 530 [8 Sup. Ct. 961, 31 L. Ed. 790]; Massachusetts v. Western Union Telegraph Co., 141 U. S. 40 [11 Sup. Ct. 889, 35 L. Ed. 628]; Maine v. Grand Trunk Ry., 142 U. S. 217 [12 Sup. Ct. 121, 163, 35 L. Ed. 994]; Pittsburgh, Cincinnati, etc., Railway v. Backus, 154 U. S. 421 [14 Sup. Ct. 1114, 38 L. Ed. 1031]; Cleveland, Cincinnati, etc., Railway v. Backus, 154 U. S. 439 [14 Sup. Ct. 1122, 38 L. Ed. 1041]; Western Union Telegraph Co. v. Taggart, 163 U. S. 1 [16 Sup. Ct. 1054, 41 L. Ed. 49]; Pullman's Palace Car Co. v. Pennsylvania, 141 U. S. 18 [11 Sup. Ct. 876, 35 L. Ed. 613]. The valuation was, thus, not confined to the wires, poles, and instruments of the telegraph company; or the roadbed, ties, rails, and spikes of the railroad company; * * * but included the proportionate part of the value resulting from the combination of the means by which the business was carried on, a value existing to an appreciable extent throughout the entire domain of operation. And it has been decided that a proper mode of ascertaining the assessable value of so much of the whole property as is situated in a particular state is, in the case of railroads, to take that part of the value of the entire road which is measured by the proportion of its length therein to the length of the whole (Pittsburgh, etc., Railway v. Backus, 154 U. S. 421 [14 Sup. Ct. 1114, 38 L. Ed. 1031]); or taking as the basis of assessment such proportion of the capital stock of a sleeping car company as the number of miles of railroad over which its cars are run in a particular state bears to the whole number of miles traversed by them in that and other states (Pullman's Palace Car Co. v. Pennsylvania, 141 U. S. 18 [11 Sup. Ct. 876, 35 L. Ed. 613]); or such a proportion of the whole value of the capital stock of a telegraph company as the length of its lines within a state bears to the length of all its lines everywhere, deducting a sum equal to the value of its real estate and machinery subject to local taxation within the state (Western Union Tel. Co. v. Taggart, 163 U. S. 1 [16 Sup. Ct. 1054, 41 L. Ed. 49]).

"Doubtless there is a distinction between the property of railroad and telegraph companies and that of express companies. The physical unity existing in the former is lacking in the latter; but there is the same unity in the use of the entire property for the specific purpose, and there are the same elements of value arising from such use. The cars of the Pullman Company did not constitute a physical unity, and their value as separate cars did not bear a direct relation to the valuation which was sustained in that case. The cars were moved by railway carriers under contract, and the taxation of the corporation in Pennsylvania was sustained on the theory that the whole property of the company might be regarded as a unit plant, with a unit value, a proportionate part of which value might be reached by the state authorities on the basis indicated.

"No more reason is perceived for limiting the valuation of the property of express companies to horses, wagons, and furniture, than that of railroad,

telegraph, and sleeping car companies, to roadbed, rails and ties, poles and wires, or cars. The unit is a unit of use and management, and the horses, wagons, safes, pouches, and furniture, the contracts for transportation facilities, the capital necessary to carry on the business, whether represented in tangible or intangible property, in Ohio, possessed a value in combination and from use in connection with the property and capital elsewhere, which could as rightfully be recognized in the assessment for taxation in the instance of these companies as the others.

"We repeat that, while the unity which exists may not be a physical unity, it is something more than a mere unity of ownership. It is a unity of use, not simply for the convenience or pecuniary profit of the owner, but existing in the very necessities of the case—resulting from the very nature of the business.

"The same party may own a manufacturing establishment in one state and a store in another, and may make profit by operating the two; but the work of each is separate. The value of the factory in itself is not conditional on that of the store, or vice versa; nor is the value of the goods manufactured and sold affected thereby. The connection between the two is merely accidental and growing out of the unity of ownership. But the property of an express company distributed through different states is as an essential condition of the business united in a single specific use. It constitutes but a single plant, made so by the very character and necessities of the business. * * * 'That an express company owns no line of railway and operates no railroad does not prevent the value of its property from being affected by the relation of each part to every other part, and the use to which a part is put as a factor in a unit business.' * * *

"There is here no attempt to tax property having a situs outside of the state, but only to place a just value on that within. Presumptively all the property of the corporation or company is held and used for the purposes of its business, and the value of its capital stock and bonds is the value of only that property so held and used. * * *"

The complainant's counsel seeks to distinguish the Ohio and Indiana express cases upon the theory that those cases refer to and permit the application of the unit rule to the intangible property of express companies only. A careful examination of those cases, and particularly the Ohio cases, indicates that the entire property, both tangible and intangible, are constituted the unit for the purpose of fixing the value, and that the language of the opinions which is claimed to support the position taken was due to the claim of counsel in those cases that the intangible property could not be taxed according to the unit rule.

I do not find, in the fact that the State Board of Assessors refused to include, in the aggregate mileage of the American Express Company, the claimed foreign and ocean mileage, any reason for setting aside the tax. Without going into the nature of this ocean mileage in detail, it may be stated that the record indicates that the character of this ocean mileage was equivocal, to say the least; that the express company did not have the ocean routes claimed, under contract as routes, but simply had arrangements for rates; that in many instances there were no arrangements for rates over the mileage claimed, but, when the express company had a shipment to be sent over the route, an arrangement was made for the carriage of that specific shipment; that no exclusive routes upon the ocean exist, and that all of the routes claimed as ocean routes were open to the business of all express companies, and that they can be claimed by the other express companies sending express matter over them as their ocean routes in the

same manner and with the same effect as they can be claimed by the American Express Company; that, during the shipment over the ocean, the express company has no protection of or control over the shipment, or over any space upon the boat, greater or different than an individual shipper; that the connection of the American Express Company with the shipments which it sends over the claimed ocean routes is more in the nature of its being a forwarder over the route, than of its being an operator of the route.

In view of these things, it is very doubtful whether any of the claimed ocean mileage should have been allowed by the state board. If any of such mileage or routes were properly allowable, it is clear that the mileage of those routes upon which there was no general contract and over which shipments were carried only upon specific arrangement from time to time, as shipments were originated and desired to be sent by the express company, could not, under any circumstances, be properly included or claimed as mileage of routes. The testimony does not sufficiently separate between the routes claimed to be covered by general contract for rates, and those claimed to be subject to specific arrangement, to enable the court to say what mileage was in the one class or the other.

This, however, becomes immaterial in view of the facts that whether this mileage could or could not be claimed and allowed as routes of the express company was at best an open question; that question was submitted to the discretion of the board, investigated by it, and determined adversely to the claim of the complainant. The court is not in a position to say that that discretion was not wisely exercised, but is, on the contrary, inclined to the view that the state board was correct in excluding such mileage.

The question of the refusal of the state board to allow for ocean mileage was presented in Fargo v. Hart, 193 U. S. 497, 24 Sup. Ct. 499, 48 L. Ed. 761, and in sustaining the board, acting under a statute like that of Michigan, in excluding that mileage the court said:

"We lay on one side, also, the question of ocean mileage. Without dwelling on the sudden change in the returns which added nearly 130,000 miles in 1898, with comparatively slight explanation, of the admitted differences between the ocean and land carriage, we cannot say that the tribunal having the duty and sole jurisdiction to find the facts exceeded its powers in not allowing the item."

In conclusion, I would say that in my judgment the Michigan statute and the assessment thereunder in question was valid and constitutional. A decree may be entered dismissing the bill of complaint, with costs.