## OPINION OF THE JUSTICES.

Supreme Court of Delaware.

March 27, 1978.

To His Excellency
Pierre S. duPont, IV
Governor of Delaware:

Reference is made to your letters dated November 21 and December 2, 1977, containing a request for the opinions of the Justices of the Supreme Court, under 10

*Del.C.* § 141,[1] upon the constitutionality of Senate Bill No. 379, as amended by Senate Amendment No. 1.

Your request contains the following background information:

"On August 9, 1977 the General Assembly passed Senate Bill Number 379, as amended by Senate Amendment Number 1, which authorizes the performance of the Spanish game of jai-alai and wagering thereon, and provides for a Delaware Jai-Alai Commission to regulate the game. I had previously vetoed House Substitute Number 1 for House Bill Number 417, as amended, which also permitted the playing of jai-alai in Delaware, because of my concern that the bill did not contain adequate regulatory procedures.

"As you are undoubtedly aware, this legislation has provoked great discussion among citizens of the State about whether wagering on jai-alai exhibitions is permitted in light of the provisions of Article II, Section 17 of the Delaware Constitution of 1897 which prohibits all forms of gambling in the State except for lotteries under State control, horse racing and bingo. Additional concern has been voiced about whether the legislation required the concurrence of two-thirds of all members elected to each House of the General Assembly pursuant to Article IX, Section 1 of the Constitution, because it may have the effect of amending the Wilmington City Charter.

"Although many comments on the effect of these constitutional provisions on Senate Bill Number 379 were presented to me during the time I was considering the bill, I felt that, as the ultimate test of constitutionality must be decided in the courts, it would not be appropriate for me to make such a determination.

"I signed Senate Bill Number 379 on August 12, 1977 (Chapter 189, Volume 61, Laws of Delaware) and on October 12, 1977 I appointed members of a Delaware Jai-Alai Commission, as I am directed to do by Section 4822 of the Act.

"However, public speculation over the constitutionality of the Act has continued. In addition, the newly designated members of the Jai-Alai Commission have expressed to me their concern that the constitutional issue be resolved before they proceed to embark on any of their activities or even formally convene. To underscore their concern, the membership has chosen to postpone taking their oaths of office and recordation of their commissions until the probability of final resolution of the subject constitutional questions is assured.

"As head of the Executive Branch, it is incumbent upon me, in order that I might faithfully discharge the duties of my office, to resolve these fundamental, constitutional concerns before the Executive Department must commit funds and hire personnel and before private individuals make substantial personal and financial commitments as Commissioners. Under Senate Bill Number 379, the Delaware Jai-Alai Commission is not placed within any executive department of State government; and therefore, is necessarily directly responsible to, and part of the Office of the Governor. I recognize, therefore, a special legal responsibility for assuring that the new Commission, whose regulatory and supervisory functions are crucial to protect the citizens of Delaware from potential abuse, begins its operations and activities free of any cloud about its authority."

Upon the basis of the foregoing, we find the request within the purview of 10 *Del.C.* § 141.

---

1. 10 *Del.C.* § 141 provides in pertinent part:
"§ 141. Advisory opinions of the Justices upon request of the Governor.
"(a) The Justices of the Supreme Court, whenever the Governor of this State may require it for public information, or to enable him to discharge the duties of his office with fidelity, may give him their opinions in writing touching the proper construction of any provision in the Constitution of this State, or of the United States, or the constitutionality of any law enacted by the General Assembly of this State * * * *".

The questions presented are as follows:

"In summary, then the three questions relating to the constitutionality of Senate Bill 379 upon which I have requested your opinion are as follows:

"1. Is pool or pari-mutuel wagering on jai-alai exhibitions a lottery for purposes of Article II, Section 17 of the Delaware Constitution of 1897?

"2. Does Senate Bill No. 379, as amended by Senate Amendment No. 1, amend the Charter of the City of Wilmington and is thus required to be enacted by the concurrence of two-thirds of all the members elected to each House of the General Assembly pursuant to Article IX, Section 1 of the Delaware Constitution of 1897?

"3. Is Senate Bill 379 in violation of Article VIII, Section 2 of the Delaware Constitution of 1897 which requires that all bills for raising revenue shall originate in the House of Representatives?"

Clearly, Question No. 1 was intended to be related directly to Senate Bill No. 379 as amended (hereinafter "the Act"), and was not intended to be stated in the abstract. Also, in our view, the word "lottery", as used in Art. II, § 17,[2] may not be isolated for scrutiny as to its constitutional meaning, but must be read in the context of the phrase in which it is used. It was so briefed and argued by counsel. Accordingly, we take Question No. 1 as reading:

Would pool or pari-muel wagering on jai-alai exhibitions under Senate Bill No. 379 be a permissible lottery under State control under Article II, Section 17 of the Delaware Constitution of 1897?

In connection with your request, we have had the valuable assistance of Assistant Attorney General Charles M. Gruver, III, who upheld the validity of the Act, as is custom-ary; and of Joseph A. Rosenthal, Esq., and Ira L. Conrad, Esq. who accepted appointment to present arguments in opposition to the Act. Leave to file briefs as *amici curiae,* in support of the Act, was granted to O. Francis Biondi, Esq., and John E. Babiarz, Jr., Esq., attorneys for Bridgeport Jai-Alai, Inc., and George C. Hering, III, Esq. and Daniel H. Krapf, Esq., attorneys for Jai-Alai Corporation of America.

## I.

A brief outline of the Act[3] is desirable for clarity:

The purpose of the Act is set forth as follows (§ 4820):

"It is the purpose of this subchapter to permit wagering or betting upon exhibitions of the Spanish game of jai-alai, which exhibitions are to be conducted only by those licensed under this subchapter and in accordance with the provisions hereof. This gambling activity is deemed by the General Assembly to be a lottery and permissible under the Constitution of this State. It is the opinion of the General Assembly that permitting such gambling activity is in the best interest of the citizens of this State. It will raise funds for the State and the City of Wilmington, provide a recreational activity, create numerous job opportunities and will provide the State and political subdivisions thereof with other economic benefits. It is also the purpose of this subchapter to exercise state control over all aspects of the operation of a jai-alai meeting in this State including but not limited to control over the conduct of the game of jai-alai, control over the conduct of the wagering or betting thereon and control over the conduct of any concessionaires providing food, beverages, parking or other goods

---

2. *Del.Const.* Art. II, § 17, as revised in 1973, provides:

"§ 17. *Lotteries and other gambling.*

"Section 17. All forms of gambling are prohibited in this State except the following:

"(a) Lotteries under State control for the purpose of raising funds,

"(b) Wagering or betting on races within the enclosure of any race meeting licensed and conducted under the laws of this State by the use of pari-mutuel machines or totalizators,

"(c) Bingo games as conducted under the limitations of Section 17A.

"The General Assembly shall enforce this Section by appropriate legislation."

3. Designated 29 *Del.C.* Ch. 48, Subchapter II, §§ 4820–4894.

and services on the premises where any such meeting is conducted."

The Act creates the Delaware Jai-Alai Commission; gives it broad regulatory powers; makes provision for licensing and licensing requirements, the conduct of licensees, and the operation by licensees of jai-alai games and pari-mutuel wagering thereon; and provides for payments to the State and the City of Wilmington from the monies generated by the jai-alai operation. The Commission has three members and they are appointed and removable by the Governor (§§ 4822, 4831). The Commission appoints a Director, experienced in the administration of jai-alai, to be its chief administrator (§ 4824).

The Commission is granted broad powers to enforce the provisions of the Act, including the power to create and enforce regulations for "insuring proper, safe and orderly conduct of jai-alai meetings and for protecting the public against fraud or overcharge" (§ 4827). The Commission has subpoena power (§ 4828), power to compel inspection or production of all books and records of a licensee[4] (§ 4873), and power to require fingerprint submissions of all applicants, licensees and employees of licensees (§ 4829). The Commission is empowered to remove employees, officials and management personnel of licensees (§§ 4852, 4873); and to levy fines and to suspend or revoke licenses (§§ 4857, 4873). Any license granted by the Commission is subject to suspension or revocation by the Commission for "good cause" and any aggrieved licensee may appeal the action of the Commission to the Superior Court (§ 4873).

Potential licensees must submit detailed financial and character information and references (§§ 4829, 4836). Application and annual license fees are required (§ 4870). The Act disqualifies from licensing all persons convicted of felonies or other crimes of moral turpitude, and also any corporation (except a publicly traded corporation) with an officer, director, or stockholder who has been so convicted (§ 4865). Corporate licensees are strictly regulated to prevent hidden interests and to subject the principals of the corporation to the various requirements of the Act (§§ 4838–4863). Licenses are not assignable (§ 4872), and all licensees must furnish annual operating reports (§ 4876). Licensed jai-alai meetings must be held in the City of Wilmington (§ 4835(b)).

Betting or wagering on jai-alai is authorized only within the confines of a licensed fronton and only under "a pari-mutuel system, so called, including standard pari-mutuel, daily double, exacta, quiniela, trifecta, and superfecta betting and such other forms of multiple betting or wagering as the Commission may determine" (§ 4883). From the gross amounts contributed to "all pari-mutuel and totalizator pools", the licensee must pay to the State 5% of the pool, plus one-half of the breakage (the odd cents in excess of 10 as calculated on the basis of each dollar wagered); and the City of Wilmington must receive $\frac{3}{4}$% of the pool. The licensee-operator of the game is to receive a commission of 12¼% of the pool, plus one-half of the breakage; and the remainder is returned to the bettors (§§ 4884, 4885).

## II.

The details of the game of jai-alai and pari-mutuel wagering thereon have been furnished by mutual agreement of counsel as follows:

The game of jai-alai is played between individuals or two-man teams. It is initiated by one player hurling a ball, called a "pelota", against the front wall, with a long basket, called a "cesta", strapped to his right arm. The ball is slightly smaller than a baseball and is as hard as and livelier than a golfball. On the serve the ball must rebound from the front wall and strike the floor within a designated service area. The opposing player must then return the ball to the front wall before the second bounce. Play continues with each player (or team) alternately being required to catch the ball in his cesta before the second bounce and to

---

4. "Licensee" includes not only the licensed operator of jai-alai, but operators of ancillary services as well, such as food concessions and parking [§ 4821(6)].

return it to the front wall. A point is lost when a player fails to so catch the ball or return it to the front wall. The ball is permitted to carom off the side or back wall before being returned to the front wall. The catch and return must be made in one continuous motion; any hesitation results in the loss of the point.

Jai-alai has been called the world's fastest sport because the ball routinely achieves speeds of 150 miles per hour. It is said that, because of the shape of the cesta, the ball is also delivered with more spin and resulting curve than in any other sport. Moreover, since the ball must strike the front wall and may carom off the side wall, back wall, and floor before being caught and since each impact alters the spin on the ball, the ball may display four different curves on any given shot. This presents difficulties not only for the player who must make the catch but also for the player making the shot who must be sure that the ball does not carom out of bounds before striking the floor. The game is one of great quickness and precision where the failure to judge speed and spin instantly usually results in the loss of a point.

In the traditional form of the sport played in Spain, jai-alai is a contest between two players or two-man teams competing in a game of from 10 to 40 individual points. In the United States, however, this form has been significantly modified to adapt it to pari-mutuel betting. Here, jai-alai is a contest among eight players or teams competing in a game of seven points. Moreover, in the American form of scoring, called the "Spectacular Seven" system, all volleys after the first round of play yield two points rather than one.

The competition among the eight players or teams (hereinafter "team") is conducted on a round-robin basis. The game is initiated with the team designated for post position No. 1 serving to the team designated for post position No. 2. The winner of that volley remains on the court to serve to team No. 3; the loser retires behind team No. 8 and returns to the court to play following team No. 8. Play continues in this fashion with the winner of each volley remaining on the court to play the next team in line and the loser retiring to the end of the line. During the first round of play, i. e. until team No. 8 has played for the first time, the winner of each volley receives one point; thereafter the winner receives two points. The first team to accumulate seven points wins the game. Thus, in order to win, a team need win no more than seven volleys and may win as few as four. When one team has won, second and third places are awarded to the teams having the second and third highest point totals at that time. Ties are played off between the tied teams.

We are told that pari-mutuel wagering on jai-alai games is "the same as wagering at horse tracks, with several innovations": A wager may be made that a team (or player) will win the game, or will "place" by finishing first or second, or will "show" by finishing at least third. There is a "quiniela" wherein the bettor selects two teams to finish first and second in any order; a "perfecta" in which two teams are selected to finish first and second in that order; and a "trifecta" in which three teams are selected to finish first, second and third, in that exact order. There is also a "double" in which the winners of two consecutive games must be selected.

Programs sold at jai-alai games are much the same as those sold at race tracks. Bettors are provided with detailed statistics of the past performances of the players and teams, together with data as to the height and weight of each player and the opening odds on each single or team. Monthly and yearly performance charts and result books on players and teams are also available to the bettor, as well as seasonal quiniela, perfecta, post position, and daily double records and statistics on the players and teams.

Official programs made available to bettors contain the following prominent statements:

"Jai-alai is known as the world's fastest ball game—a game which sport's experts agree requires more skill, speed, endurance, and nerve than any other."

\*  \*  \*  \*  \*  \*

"Pari-mutuel wagering rules * * * state that * * * jai-alai being a game of skill, the winning or losing of a point depends entirely on the individual player's skill and ability or lack of it, * * *."

\* \* \* \* \* \*

"Players salaries for the next year depend on their respective performances this year."

\* \* \* \* \* \*

"Players are given purses for win, place, and show, in addition to their regular salary."

### III.

### A.

The ultimate question is whether pool or pari-mutuel wagering[5] is a "lottery" under Art. II, § 17(a). In our opinions, it is not.

**5.** It is agreed by all involved that pari-mutuel betting is a form of pool selling. For example, in horse racing, all money wagered is initially divided into several pools, such as the win, place, and show pools, and after the deduction of a percentage for the operators and the State, the remainder is distributed to the successful bettors in proportion to their contributions to the various pools. See e. g., *Utah State Fair Ass'n. v. Green,* Utah Supr., 68 Utah 251, 249 P. 1016 (1926); *Ginsburg v. Centennial Turf Club,* Colo.Supr., 126 Colo. 471, 251 P.2d 926 (1952).

**6.** The sentiments of one eminent member of the Constitutional Convention member (later Judge Spruance) regarding lotteries and pools was expressed as follows:

"Now as to lotteries; I have all my life, from the time I was a young fellow here in Dover studying law, when the support of lotteries prevailed, and even reached our Bench, and almost every lawyer in the State was in the pay of the lottery companies—been opposed to lotteries and pool selling.

"The latter, I believe, applies chiefly to horse racing.

\* \* \* \* \* \*

"The two species of gambling which are indicated here from the experience in this State and in other States, are the proper subjects of a Constitutional provision, and in respect to their legislation allowing them should be prohibited: one of these forms of gambling is lotteries." 1897 *Const. Debates,* Vol. 4, pp. 2872, 2877.

**7.** Just as Judge Spruance related pool-selling to horse races, he undoubtedly related lotteries to

The original 1897 version of Art. II, § 17 provided:

"Lotteries, the sale of lottery tickets, pool selling and all other forms of gambling are prohibited in this State. The General Assembly shall enforce this section by appropriate legislation".

It appears that the 1897 drafters distinguished lotteries and pool-selling as separate types of gambling sufficiently objectionable to be specified by name, and that pool-selling, unlike lotteries, was a form of gambling generally understood to be related to horse racing.[6] 1897 *Delaware Constitutional Debates,* Vol. 4, pp. 2871–2885. In common usage and by definition, this understanding of a basic difference between lotteries and pool-selling was general then,[7] as it is now.[8]

The express prohibition of pool-selling remained in Art. II, § 17 until 1973 when the

the practice long existing in this State of financing public improvements by the sale of lottery tickets, and the unfortunate experiences sustained by the public here and elsewhere, as the result of the defalcations of certain lottery operators. E. g., 11 *Del.L.* 594 (1859) empowering one Richard France of Baltimore to "prepare schemes of lotteries, to sell lottery tickets, and to draw lotteries in this State * * * for 20 years" in consideration of the sum of $720,-000 to be used for specified "internal improvements" in the State; and 12 *Del.L.* 219 (1862) rescinding those powers and directing criminal prosecutions.

**8.** A lottery is defined:

"A gambling game or method of raising money, as for some public, charitable purpose, in which a large number of tickets are sold, and *a drawing is held for certain prizes;* any scheme for the distribution of prizes by chance; * * *" (emphasis supplied). *The Random House Dictionary of the English Language.* (Unabridged Ed.) p. 848.

Sports pool betting is defined in *Black's Law Dictionary,* p. 1321:

"In various methods of gambling, a 'pool' is a sum of money made up of the stakes contributed by various persons, the whole of which is then *wagered as a stake on the event of a race, game, or other contest,* and the the winnings (if any) are divided among the contributors to the pool pro rata. Or it is a sum similarly made up by the contributions of several persons, each of whom then makes his guess or prediction as to the event of a future contest or hazard, the successful bettor taking the entire pool." (emphasis supplied)

Article was revised and entirely rewritten upon the advent of the Lottery Exception as § 17(a). (59 *Del.L.* Ch. 143). In the intervening years between 1897 and 1973, however, the express prohibition against pool-selling remained in Art. II, § 17, throughout the 1935 amendment (40 *Del.L.* Ch. 1) excepting on-track pari-mutuel betting on races, and the 1957 amendment (51 *Del.L.* Ch. 61) excepting the game of bingo, from the general prohibition of the Section against "all forms of gambling."

In the 1973 Revision of the Section, pool-selling was omitted as the only remaining itemized form of prohibited gambling after the Lottery Exception was created. But its omission did not constitute a general exception of pool-selling, express or implied, to the general prohibition against "all forms of gambling". The omission of specifics, especially one remaining specific, was good, modern constitutional draftsmanship.

■ As presently written, Art. II, § 17 prohibits "all forms of gambling" except those expressly authorized, i. e., on-track pari-mutuel betting on racing, bingo, and lotteries. Any exception to such general constitutional prohibition must be narrowly and strictly construed. *U. S. v. Allen,* 163 U.S. 499, 16 S.Ct. 1071, 41 L.Ed. 242 (1895); *E. I. DuPont De Nemours & Co. v. Clark,* Del.Supr., 88 A.2d 436 (1952); *County Council, etc. v. Supervisor of Assessments, etc.,* Md.Ct.App., 274 Md. 116, 332 A.2d 897 (1975); *Karafa v. N.J. State Lottery Commission,* N.J.Super., 129 N.J.Super. 499, 324 A.2d 97 (1974).

■ Except for on-track pari-mutuel betting authorized by § 17(b), pool-selling is not excepted from the general anti-gambling prohibition of Art. II, § 17 by any express provision. We are of the opinion, therefore, that all other forms of pari-mutuel betting remain constitutionally banned. It strains established rules of constitutional construction too far to say, as do the proponents of the Act, that unlimited pool-selling was excepted from the general anti-gambling prohibition of § 17 *by implication.* It is unreasonable to assume that the drafters of the 1973 Revision intended *by implication* to legalize unlimited pool or pari-mutuel betting, including, for example, off-track pari-mutuel betting on racing, in the face of the continuing provisions of § 17(b) expressly and carefully delimiting pari-mutuel betting to on-track wagering.

The proponents contend that § 4805(b)(4)[9] of the State Lottery Act is persuasive evidence that the drafters of the 1973 Revision[10] intended, by implication, to

---

And a betting "pool" is defined in *Webster's Third New International Dictionary* p. 1764 as:
"All the money *bet* by a number of persons *on the result of a particular event* with the aggregate to be paid to the winner or divided among several winners according to conditions established in advance." (emphasis supplied)

The three elements of a lottery, as a matter of law, are generally stated to be: prize, consideration, and chance. *Affiliated Enterprises, Inc. v. Waller,* Del.Super., 5 A.2d 257, 259 (1939). However, there is contrariety of judicial opinion as to whether a game that incorporates an element of skill as well can qualify as a lottery. Under the English rule, if skill plays any part in determining the prize winner, there is no lottery. Under the prevailing American rule, it is sufficient if chance is the dominant or controlling factor. See *National Football League v. Governor of State of Delaware,* D.Del., 435 F.Supp. 1372, 1382–3 (1977). The *decision as to which rule applies often seems to* depend upon whether the case is a tax case or a regulation case. The Courts of this State have not ruled on whether the "pure chance"

or "dominant factor" rule applies in Delaware. Fortunately, we are not obliged to adopt and apply either one or the other of these two rules in this expedited, quasi-judicial proceeding.

**9.** 29 *Del.C.* § 4805(b)(4) empowered the State Lottery Director:
"(4). Enter into contracts for the operation of any game or part thereof and into contracts for the promotion of the game or games. This authorization is to be construed to include, but not be limited to, contracting with any racing or other sporting association to conduct sporting events within any racetrack or sports field in the State the outcome of which shall determine the winners of a state game or, as an alternative, to affiliate the determination of the winners of a game with any racing or sporting event held with or without the State . . . ."

**10.** All references herein to the intention of the drafters of the 1973 Revision of Art. II, § 17, include the drafters of the 1971 "first leg" as well as the identical 1973 "second leg" thereof.

remove the 75 year old constitutional prohibition against pool-selling and pari-mutuel betting. We find this contention wholly untenable. The history of the present State Lottery has demonstrated various possible interrelationships between State games and sporting events, none of which involved pari-mutuel betting. To accept the proponents' contention on this point would be to see implied in § 4805(b)(4) of the State Lottery Act, an unlimited authorization for the State, under the guise of a § 17(a) lottery, to operate a pari-mutuel system of betting on any type of sporting event, on or off the premises—in the face of the general constitutional ban against "all forms of gambling" and in conflict with the express provision of § 17(b) unequivocally limiting pari-mutuel betting to on-track racing. To state the proposition is to demonstrate its absurdity.

In our opinions, therefore, it is unreasonable to assume, as the proponents urge, that the drafters of the 1973 Revision intended to include unlimited sports pool-selling or pari-mutuel wagering within the word "lottery" as an exception to the general prohibition against "all forms of gambling". Several reasons support this conclusion: (1) Historically, as has been noted, the word "lottery" did not include "pool selling" and the two forms of gambling were distinguished at the Constitutional Convention of 1897; (2) by common usage and ordinary definition, the two forms of gambling have been clearly differentiated; (3) following the lead of the 1897 Constitutional drafters,

later constitutional drafters have consistently distinguished between lotteries and pool-betting and other types of gambling, expressly maintaining the distinction in both the 1935 Racing Amendment and the 1957 Bingo Amendment; and (4) prevailing case law would have guided the 1973 drafters away from the word "lottery" and along other lines if they had intended to legalize unlimited pool-selling and pari-mutuel wagering in this State. We address the last point briefly.

For decades, by the great weight of authority, pari-mutuel betting has been held not to be a lottery.[11] E. g., *Engle v. State*, Ariz.Supr., 53 Ariz. 458, 90 P.2d 988 (1939); *Longstreth v. Cook*, Ark.Supr., 215 Ark. 72, 220 S.W.2d 433 (1949); *Ginsberg v. Centennial Turf Club*, Colo.Supr., 126 Colo. 471, 251 P.2d 926 (1952); *People v. Monroe*, Ill. Supr., 349 Ill. 270, 182 N.E. 439 (1932); *Commonwealth v. Kentucky Jockey Club*, Ky.Ct.App., 238 Ky. 739, 38 S.W.2d 987 (1931); *Gandolfo v. Louisiana State Racing Commission*, La.Supr., 227 La. 45, 78 So.2d 504 (1954); *Rohan v. Detroit Racing Ass'n.*, Mich.Supr., 314 Mich. 326, 22 N.W.2d 433 (1946); *People, etc. v. Fallon*, N.Y.Supr., 4 App.Div. 82, 39 N.Y.S. 865 (1896); *Multnomah County Fair Ass'n. v. Langley*, Or. Supr., 140 Or. 172, 13 P.2d 354 (1932); *Utah State Fair Ass'n. v. Green*, Utah Supr., 68 Utah 251, 249 P. 1016 (1926); *Oneida County Fair Board v. Smylie*, Idaho Supr., 86 Idaho 341, 386 P.2d 374 (1963); *Opinion of the Justices*, Ala.Supr., 287 Ala. 334, 251 So.2d 751 (1971).[12]

**11.** No pari-mutuel betting cases except racing cases have come to our attention. Also, no lottery case has been brought to our attention involving wagering on the outcome of a single sporting event. The analogy of pari-mutuel betting on races to pari-mutuel betting on jai alai games is obvious: both involve sporting events in which the skill, condition, and experience of the participants are important elements; in both, the bettor has information and opportunity enabling him to exercise his judgment and discretion in placing his bet; and in both, the form and method of wagering is substantially the same.

**12.** The rationale of these authorities may be summarized as follows:

"In a lottery the winner is determined by lot. Lot or chance is the determining factor and a participant has no opportunity to materially exercise his reason, judgment, sagacity, or discretion. In a horse race the winner is not determined by chance alone, as the condition, speed, and endurance of the horse and the skill and management of the rider are factors affecting the result of the race. The bettor has the opportunity to exercise his judgment and discretion in determining the horse on which to bet. The pari-mutuel method or system of betting on a horse race (as described in the opinion of the majority) does not affect or determine the result of the race. The machine is no doubt a convenient mechanical device for recording and tabulating information regarding

By comparison, the minority view is supported by the following few authorities cited by the proponents: *Pompano Horse Club v. State,* Fla.Supr., 93 Fla. 415, 111 So. 801 (1927) and *State v. Ak-Sar-Ben Exposition Co.,* Nebr.Supr., 226 N.W. 705 (1929) (combining discussion of lotteries and gambling generally); *State ex rel. Moore v. Bissing,* Kan.Supr., 178 Kan. 111, 283 P.2d 418 (1955) (in which the word "lottery" is defined in detail in the constitutional provision); *Streeper v. Auditorium Kennel Club,* N.J. Supr., 13 N.J.Misc. 584, 180 A. 212 (1935).

■ Clearly, therefore, prevailing case law does not warrant the conclusion that the drafters of the 1973 Revision intended, by implication, to encompass unlimited pool-selling and pari-mutuel betting within the word "Lotteries."

\*　　\*　　\*　　\*　　\*　　\*

■ In the face of the foregoing evolution of Art. II, § 17, the proponents point to the pronouncement in the 1977 Act (§ 4820) that the pari-mutuel betting on jai-alai games there authorized "is deemed by the General Assembly to be a lottery and permissible under the Constitution of this State." This statement merits deferential consideration, of course, as do all legislative pronouncements. But the proponents urge that controlling effect be given to this statement, apparently under the doctrine of contemporaneous legislative construction. See 2A *Southerland Statutory Construction,* Ch. 49. However, the self-serving statements of validity in the 1977 Act were not made contemporaneously by the same General Assembly that consummated the 1973 Lottery Amendment. Two elections and

four years had intervened. Thus, in our opinions, the doctrine of contemporary legislative construction is inapposite here and the legislative statements of constitutional conformity contained in the 1977 Act may not be accorded determinative weight in the proper exercise of the judicial responsibility for constitutional interpretation. Any view to the contrary stands wholly unsupported by analysis, authority, or case law. Compare *Myers v. United States,* 272 U.S. 52, 47 S.Ct. 21, 45, 71 L.Ed. 160 (1926); *Brennan v. Kroger Co.,* 8 Cir., 513 F.2d 961 (1975).

■ In the final analysis, the interpretation of the Constitution, in the light of the presumption of constitutionality that cloaks all legislative acts, is an inherent judicial responsibility.[13] In the fulfillment of that constitutional duty, we may not accord to the 1977 statements of the drafters of the Act conclusive weight as we search for the intent of the drafters of the 1973 Revision of Art. II, § 17. See *Brennan v. Kroger Co.,* 8 Cir., 513 F.2d 961 (1975). We may not accept legislative pronouncements of constitutional validity as a measure of our judicial duty under the Constitution. To do so would be to abdicate a constitutional responsibility. The Pennsylvania Supreme Court made this point with singular clarity in *School Dists. of Deer Lakes, etc. v. Kane,* Pa.Supr., 463 Pa. 554, 345 A.2d 658, 662 (1975) when it stated:

"Although the interpretation placed upon the constitution by the legislature in the course of its enactment of statutes is entitled to great weight, that interpretation cannot be conclusive upon the courts

---

the number and amount of bets and from this information the betting odds on the horse can be calculated and determined from time to time during the process of betting. The recording and tabulating of bets could be done manually by individuals, but the pari-mutuel machine is a more convenient and faster method. The fact that a better cannot determine the exact amount of money he may win at the time he places his bet because the odds may change during the course of betting on a race does not make the betting a mere game of chance, since the better can exercise his reason, judgment, and discretion, in selecting the horse he thinks will win. Horse racing, like foot races, boat

races, football, and baseball, is a game in which the skill and judgment of man enter into the outcome to a marked degree and is not a game where chance is the dominant factor." *Opinion of the Justices,* Ala.Supr., 249 Ala. 516, 31 So.2d 753, 761 (1947) [approved *Opinion of the Justices,* Ala.Supr., 287 Ala. 334, 251 So.2d 751, 753 (1971)].

13. Established as a cardinal principle of American government in the milestone opinion of Chief Justice John Marshall in *Marbury v. Madison,* 1 Cranch 137, 5 U.S. 137, 2 L.Ed. 60 (1803).

in their decision of cases, for judges, no less than legislators are sworn to uphold the fundamental law."

We recognize that, in *National Football League v. Governor of Delaware, et al.,* D.Del., 435 F.Supp. 1372, 1386 (1977), the Court stated:

"I do not believe any clear inference as to legislative intent can be drawn from the failure to mention pool selling in the revised Section 17. However, if I were inclined to draw one, I find defendants' explanation, that the General Assembly intended to drop the distinction between lotteries and pool selling and to leave open the possibility that the State Lottery Office might adopt a pool selling type game as part of the State Lottery the more plausible one."

*NFL* involved a variety of games conducted by the State Lottery Director, based upon fourteen weekly football games throughout the country, in which successful betters were obliged to select the winners and point spreads of multiple football games, ranging from three to twelve. "None of the games permits head-to-head or single game betting" 435 F.Supp. at 1385. *NFL* did not involve pari-mutuel betting and the Court there was not obliged to make a definitive ruling upon the factual or legal issues here involved.

In short, in *NFL* the Court was analyzing a "lottery" conducted under terms and conditions substantially different from those presented here. For example: in the *NFL* case the State operated and controlled the gambling (not a privately franchised operator); there the competitors in the games were teams in the National Football League (not salaried players performing for the same owner); there the gambling games did not permit head-to-head betting (here the entire betting scheme is based on the result of a series of head-to-head games among the same competitors); and there the betting was done through the purchase of lottery tickets (and not by a pari-mutuel

system). Thus, *NFL* is inapposite to the questions here presented.

The proponents also rely heavily upon *Commonwealth v. Laniewski,* Pa.Super., 173 Pa.Super. 245, 98 A.2d 215 (1953). In that case, like *NFL,* a football pool was found to be a lottery. For most of the same reasons which distinguish *NFL* from the situation before us, we find *Laniewski* unpersuasive.

Our attention has also been called to *Greater Loretta Improvement Association v. State ex rel. Boone,* Fla.Supr., 234 So.2d 665 (1970), in which the game of bingo was held to be a "lottery" within the meaning of that term as used in the Florida Constitution. The history and evolution of the various gambling provisions of Florida constitutions and statutes, as set out in *Loretta,* differ so widely from those of Delaware as to make *Loretta* of little value either as to the questions here presented or as to the application of the doctrine of contemporaneous statutory construction upon which the proponents rely. For the reasons above stated, we especially disagree with the rule adopted in *Loretta* that judicial responsibility for the construction of constitutional ambiguity permits a legislative interpretation of that ambiguity to be "well-nigh, if not completely, controlling." (234 So.2d at 669).

Finally, the proponents point to § 4803(b) [14] of the State Lottery Act as sufficient basis for the conclusion that the drafters intended to include the pool or pari-mutuel system of betting on sporting events within the term "Lottery" as used in Art. II, § 17(a). We find nothing in § 4803(b) to support that conclusion in the light of all the foregoing reasons to the contrary.

\* \* \* \* \* \*

In summary: It is clear from the foregoing, in our opinions, that the authors of the 1973 Revision did not ignore the history and progression of Art. II, § 17; it is neither reasonable nor realistic to assume that they did. The pattern of amendments of § 17

---

**14.** § 4803(b) of the State Lottery Act provides:

"(b) 'Lottery' or 'state lottery' or 'system' shall mean the public gaming systems or

games established and operated pursuant to this subchapter and including all types of lotteries."

has been characterized consistently by the adoption of specific and narrow exceptions to the general constitutional interdiction against gambling. Governed, as a constitutional exception is, by the rule of narrow and strict construction, the Lottery Exception may not be given the broad and expansive interpretation, urged by the proponents, which would legalize unlimited pari-mutuel betting on all types of sporting events, on and off the premises, under the guise of the Lottery Exception. If the 1973 drafters had intended to eliminate the 75 year old distinction between lotteries and pool selling, and if they had intended to remove from the general constitutional prohibition the many types of gambling which would be permissible under the broad construction of the word "lottery" urged by the proponents, we think it indisputable that they would have done so in clear and unmistakable terms and not left it to implication and inference which would require such mental and legal gymnastics to accept. And the constitutional void may not be filled by according to self-validating pronouncements in the Act itself conclusive value in the determination of its constitutionality. To do so would be to relinquish the inherent judicial responsibility of constitutional interpretation.

It is our conclusion that the pool or pari-mutuel system of wagering has never been considered a "lottery" by the constitutional draftsmen of our State—either in 1897 or in 1973—and that it may not be made so now either by legislative act or judicial fiat. Common and ordinary understanding of the word "lottery", then and now, rejects the concept of pari-mutuel betting on sporting events. Moreover, the historical evolution of Art. II, § 17 and the great weight of authority are in harmony with this result and lead inescapably to the conclusion that a sound basis in reason, logic, and experience exists in support of the result we reach.

**15.** It is noteworthy that many provisions of the Act here under consideration were taken from the Delaware Racing Commission Statute, 28

■ Specifically, therefore, we are of the opinion that pool or pari-mutuel wagering on jai-alai exhibitions under the Act would not be a "lottery" within the meaning of Art. II, § 17(a).

#### B.

■ Furthermore, we are of the opinion that the gambling activities permitted by the Act would not be "under State control" within the meaning of Art. II, § 17(a).

The word "control" has varied meanings. By definition and judicial usage, it may mean to regulate; restrain; dominate; govern; guide; manage; direct; superintend; operate. E. g., *Black's Law Dictionary* (4th Ed. 1968); *Feinman v. A. H. Bull S.S. Co.,* E.D.Pa., 107 F.Supp. 153 (1952). *Gulf Refining Company v. Fox,* S.D.W.Va., 11 F.Supp. 425 (1935). As indicated above, the rule of constitutional construction which governs here is the rule of narrow and strict interpretation.

The basic inquiry, in our view, comes down to this: Did the drafters of the 1973 Lottery Exception intend to authorize pari-mutuel betting operated by a licensee at a sporting event operated by a licensee under the regulation of a State Commission such as is authorized by the Act. We think not for the following reasons:

(1) When writing the 1973 Lottery Exception, the drafters had before them the 1936 Racing License Exception and its implementing statute (28 *Del.C.* Ch. 3), then in existence for almost 40 years. If such licensed operation under regulation by a Commission had been intended, the intent need not have been buried within such undefined and ambiguous words as "State control". It could have been openly and clearly authorized by amending the Racing License Exception to read: "Wagering or betting on races [or other sporting events] within the enclosure of any race meeting [or sports field] licensed and conducted under the laws of this State by the use of pari-mutuel machines or totalizers." [15]

*Del.C.,* Ch. 3, particularly regarding the regulatory powers of the Commission.

(2) If such licensed operation under regulation by a Commission had been intended, it could have been openly and clearly authorized, as was the 1957 Bingo License Exception (which had been on the books together with its implementing Statute, 28 *Del.C.* Ch. 11, for over 15 years), by a detailed constitutional provision as to the parameters of the new license Exception.[16]

(3) The "second leg" of the Lottery Exception in Art. II, § 17 was adopted by the 127th General Assembly on June 25, 1973 (59 *Del.L.* Ch. 143).[17] Several months later, the 127th General Assembly also enacted the State Lottery Act (approved May 1974, 59 *Del.L.* Ch. 348, 29 *Del.C.*, Ch. 48). We look to the latter contemporary action of that General Assembly as illumination of the intent of the drafters of the Lottery Exception.

The express purpose of the State Lottery Act was:

" * * * to establish a state-operated lottery under the supervision of a Director who shall be appointed by the Secretary of Finance with the written approval of the Governor and hold broad authority to administer the system in a manner which will produce the greatest income for the State". 29 *Del.C.* § 4801.

And it was provided by the Statute that the State Lottery Office "shall exist as part of the Department of Finance and shall be administered by a Director, responsible for the operation of a state lottery". 29 *Del.C.* § 4802.

This action by the same General Assembly—the creation of a State-operated lottery—within a few months after it had completed the constitutional amendment creating the Lottery Exception, is the most persuasive indication we have as to the intent of the drafters in their use of the language "under State control" in Art. II, § 17(a). In our opinion, the Lottery Exception and the implementing State Lottery Act were closely interrelated, the former being especially created, we believe, to enable the enactment of the latter.

In the final analysis, the ultimate State control provided by the Act is limited to suspension or revocation of a license for a "good cause" which is nowhere defined and which is subject to litigation upon appeal by the licensee.[18]

■ Bound as we are to a narrow and strict interpretation of any exception to a general constitutional prohibition, and without any more dependable indicia of an intent of the drafters to the contrary, we must conclude that the language "under State control", as used in Art. II, § 17, was intended to mean "under State operation".

The proponents of the Act urge acceptance of various dictionary definitions of the word "control" which are equally akin to regulation as to operation. For the reasons stated, we find such definitions unacceptable in the context of Art. II, § 17(a).

The proponents of the Act also cite authorities for the proposition that the words "state control" are not synonymous with "state operation", including *Crist v. Potomac Insurance Company*, Or.Supr., 413 P.2d 407 (1966); *Boyles v. County Court of Barbour County*, W.Va.Supr., 116 W.Va. 689, 182 S.E. 868 (1935); and *Crisanti v. Cremo Brewing Co.*, Conn.Supr., 136 Conn. 529, 72 A.2d 655 (1950). The cases are inapposite on the facts.

The proponents also contend controlling effect must · be accorded the pronouncements of the General Assembly in the Act that it is "the purpose of this subchapter to

---

**16.** See *Del.Const.*, Art. II, § 17A limiting bingo gambling to "Volunteer Fire Companies, Veterans' Organizations, Religious or Charitable Organizations, or by Fraternal Societies".

**17.** The Delaware Constitution may be amended by two-thirds vote of all members elected to each House of two successive General Assemblies. *Del.Const.*, Art. XVI, § 1.

**18.** Compare the power of the Delaware Racing Commission: "Any license issued by the Commission shall be subject to suspension or revocation by the Commission *for any cause whatsoever which the Commission may deem sufficient*", subject to judicial review. 28 *Del.C.* § 325. The Harness Racing Commission has similar power, 28 *Del.C.* § 525, as does the Bingo Commission, 28 *Del.C.* § 1154. (emphasis supplied)

exercise state control over all aspects of the operation of a jai-alai meeting in this State * * * " (§ 4820). As heretofore stated, such purported self-validating statements in the 1977 Act were not made by the same General Assembly which had consummated the Lottery Amendment to Art. II, § 17 in 1973. And, as previously stated at length, while such statements of purpose in the body of Act must be accorded due deference, of course, they may not be accepted as determinative of the intent of the drafters of the Lottery Amendment to Art. II, § 17 or as a measure of the performance of the inherent responsibility of the judiciary to interpret the Constitution. Any view to the contrary stands unsupported by acceptable rationale or authority, and, in our opinion, would be tantamount to abdication of inherent constitutional judicial duty.

\* \* \* \* \* \*

Finally, in considering the proponent's arguments, we are mindful that every statute is cloaked with a presumption of constitutionality and should not be declared invalid unless its invalidity is beyond doubt. We are convinced that the history of Art. II, § 17 and the evolution of the Lottery Exception thereto, plus the governing rule of narrow and strict construction, overcomes the presumption and removes the constitutionality of the Act from the "fairly debatable" category. *Justice v. Gatchell*, Del. Supr., 325 A.2d 97, 102 (1974).

Beyond reasonable doubt, in our opinion, the Act is an unconstitutional attempt to stretch the Lottery Exception beyond permissible boundaries and to squeeze into it a licensed pari-mutuel gambling activity clearly not within the intent of the drafters of the 1973 Revision of Art. II, § 17.

\* \* \* \* \* \*

Accordingly, in our opinions, the Act contravenes *Del.Const.*, Art. II § 17.

### IV.

In view of the dispositive conclusions announced upon Question No. 1, we abstain as to Questions Nos. 2 and 3 upon the ground of mootness.

### V.

For the foregoing reasons, we respond to the Questions presented as follows:

Question No. 1: Negative
Question No. 2: Abstain
Question No. 3: Abstain

\* \* \* \* \* \*

The Justices regret the delay in responding to this request. The matter was briefed by counsel during December, and oral arguments were heard on January 9, 1978. The delay has resulted from the novelty and difficulty of the questions presented, the pressures of other prior important business confronting the Court, and the efforts made to reconcile the divergent opinions of the Justices.

Respectfully,

DANIEL L. HERRMANN
Chief Justice

WILLIAM DUFFY
Justice

The following is the opinion of Justice McNEILLY:

To His Excellency
Pierre S. duPont, IV.
Governor of the State of Delaware:

In response to your letters of November 21, 1977, and December 2, 1977, requesting the opinions of the Justices of the Supreme Court concerning the constitutionality of Senate Bill 379, as amended by Senate Amendment Number 1 (the Jai-Alai Act), the majority of Justices have responded opining that the Jai-Alai Act contains a variety of constitutional infirmities. While I agree with the majority's exposition of the historical background of Article II, Section 17 of the Delaware Constitution of 1897, the detailed description of the pertinent provisions of the Jai-Alai Act, particularly those pertaining to the state control aspects of the Act, and to the details of the game of jai-alai and pari-mutuel wagering thereon under the Act, I disagree with the legal conclusions reached by the majority. For the sake of brevity I shall not repeat

the background material except as may be necessary to support my conclusion that the Jai-Alai Act passes constitutional muster.

## I

The Questions Presented [1] ask:

1) Is pool or pari-mutuel wagering on jai-alai exhibitions a lottery for purposes of Article II, Section 17 of the Delaware Constitution of 1897?

3) Is Senate Bill 379 in violation of Article VIII, Section 2 of the Delaware Constitution of 1897 which requires that all bills for raising revenue shall originate in the House of Representatives?

My response to question number 1 is in the affirmative, as I am of the opinion that pari-mutuel wagering on jai-alai as envisaged by the Act constitutes a lottery under Delaware law, compare *Affiliated Enterprises v. Waller*, Del.Super., 5 A.2d 257 (1939), that the Act contains provisions for adequate state control, and that the purpose of the Jai-Alai Act is to raise funds for the State of Delaware and the City of Wilmington.

My response to question number 3 is negative, as I am of the opinion that the Jai-Alai Act is not a revenue raising bill subject to the requirements of Article VIII, Section 2 of the Delaware Constitution.

## II

### A.

When determining that the proposed pari-mutuel wagering on jai-alai is not a lottery, the majority provides a learned review of Delaware constitutional history of anti-gambling provisions, and the exceptions thereto. According to the majority, pool wagering cannot be encompassed within the word lottery because (1) historically lottery did not include pool selling, as the two forms of wagering were distinguished at the Constitutional Convention of 1897, (2) by common usage the two forms of betting are distinguished, (3) following the lead of the 1897 constitutional drafters, la-

ter constitutional writers, in drafting the 1935 Racing Amendment and the 1957 Bingo Amendment, recognized and maintained the distinction between pool wagering and lotteries, and (4) prevailing case law which recognizes the distinction, would have guided the 1973 amendment writers away from the word "lottery" if they intended to legalize pool-selling and pari-mutuel wagering. While I find the majority's analysis interesting, my opinion is that the definition of lottery at which the majority eventually arrives is outmoded, and inapplicable to the case *sub judice*. I believe that the majority misdirects its attention to ancient history, dictionary definitions, and certain case law which it considered to be prevailing, while ignoring modern pronouncements of the Delaware Legislature concerning the definition of "lottery".

I examine first the majority's exposition of case law dealing with the term "lottery". The majority states: "For decades, by the great weight of authority, pari-mutuel betting has been held not to be a lottery." A series of citations to cases follows in support of the above-quoted assertion. I submit that one must examine the context in which these authoritative cases were decided. Each case cited by the majority dealt with the question of whether pari-mutuel betting on races fell within the constitutional proscription of lotteries, *when the legislature had chosen to declare that the activity was not a lottery by the enactment of publicly desired racing legislation.* See, e. g., *Engle v. State*, Ariz.Supr., 53 Ariz. 458, 90 P.2d 988 (1939); *Longstreth v. Cook*, Ark.Supr., 215 Ark. 72, 220 S.W.2d 433 (1949); *Ginsberg v. Centennial Turf Club*, Colo.Supr., 126 Colo. 471, 251 P.2d 926 (1952); *People v. Munroe*, Ill.Supr., 349 Ill. 270, 182 N.E. 439 (1932); *Commonwealth v. Kentucky Jockey Club*, Ky.Supr., 238 Ky. 739, 38 S.W.2d 987 (1931); *Gandolfo v. Louisiana State Racing Commission*, La.Supr., 227 La. 45, 78 So.2d 504 (1954); *Rohan v. Detroit Racing Ass'n.*, Mich.Supr., 314 Mich. 326, 22 N.W.2d 433 (1946); *People, etc. v. Fallon*, N.Y.Supr., 4 App.Div. 82, 39 N.Y.S.

---

1. By consent of all parties Question Number 2 has been eliminated from consideration.

865 (1896); *Utah State Fair Ass'n v. Green*, Utah Supr., 68 Utah 251, 249 P. 1016 (1926); *Oneida County Fair Board v. Smylie, Governor*, Idaho Supr., 86 Idaho 341, 386 P.2d 374 (1963); *Opinion of the Justices*, Ala. Supr., 287 Ala. 334, 251 So.2d 751 (1971).

The Idaho Supreme Court in *Braddock v. Family Finance Corporation*, Idaho Supr., 95 Idaho 256, 506 P.2d 824 (1973) analyzed its decision in *Oneida County Fair Ass'n. v. Smylie*, supra, as ". . . an attempt to reconcile the constitutional prohibition against lotteries with the legislative desire to legitimize horse racing." The cases cited involve constitutional or statutory bans on lotteries, while here we deal with a constitutional prohibition on most forms of gambling, lotteries being one of the exceptions to the general prohibition. Thus in the cases upon which the majority relies, a judicial finding that pari-mutuel wagering on races was a lottery would have necessitated a ruling striking down an enactment of the legislature, whereas, the converse is true here. The distinction, I believe, is critical, because of the general rule of law that legitimately enacted laws of a Legislature are accorded a presumption of constitutionality. As the Court stated in *Rohan v. Detroit Racing Ass'n.*, supra: "The statute is presumed to be constitutional, and every reasonable presumption or intendment must be in favor of its constitutionality." Therefore, an important, if not controlling, factor in each of the cases cited was the rule of presumption of constitutionality. The conclusion I reach in my analysis of the cited cases is that the term "lottery" is ambiguous, and, as a proposition of law, where an ambiguous term is used, the legislative interpretation of a word is well-nigh conclusive upon judicial review. I believe the majority misses the point of the cases when they merely examine the result reached, and not the reasoning behind the result.[2]

I turn now to what I believe is a more rational analysis of what the Delaware Legislature meant when it used the term "lottery" in the 1973 Constitutional Amendment. Judge Stapleton of the Federal District Court in Delaware addressed the issue of what the term "lottery" as used in the Delaware Constitution means in the case of *Nat. Football League v. Governor of the State of Delaware*, D.Del., 435 F.Supp. 1372 (1977). I adopt Judge Stapleton's cogent analysis of the Constitutional Amendment, and his definition of lottery derived from the amendment and contemporaneous legislation dealing with lotteries. I can say it no better than he, and I quote those portions of Judge Stapleton's opinion which are on point:

> "The 1974 Amendment to Article II, Section 17 of the Delaware Constitution authorizes lotteries under State control. It does not define the term 'lottery'."

> \* \* \* \* \* \*

> It is unquestioned that there are three elements necessary to a lottery: prize, consideration and chance. [citing *Affiliated Enterprises v. Waller*, Del.Super., 5 A.2d 257 (1939)]. However, there is a split of authority as to whether a game that incorporates an element of skill as well can qualify as a lottery. Two approaches to the question have developed:

---

**2.** It is interesting to note the extent of the struggle of the Alabama Supreme Court when dealing with the issue of what is a lottery. The majority cites the case of *Opinion of the Justices*, supra, as part of decades worth of prevailing case law. In the Alabama opinion it was stated:

> "The question presented then is whether or not the pari-mutuel system of wagering on dog races as authorized by these bills constitutes a lottery. Twice in the past the Legislature has called on the Justices for an opinion on essentially this same point. . . ."

In 1947 the Alabama Justices response was four to three that it was a lottery. In 1961 the response was six evenly divided, and one abstention.

In the 1971 opinion relied upon, five Justices said it was not a lottery, two said it was, and Chief Justice Heflin declined to vote. I note the history of the issue in this most recent case cited by the majority to emphasize that the question of what is a lottery has troubled Courts for many years, and there is no great weight of authority mandating that pari-mutuel wagering be distinguished from lotteries. On the contrary, the emphasis of the cases seems to be on the presumption of validity afforded acts of the Legislature.

Under the English rule, a lottery consists in the distribution of money or other property by chance, and nothing but chance, that is, by doing that which is equivalent to drawing lots. If merit or skill play any part in determining the distribution, there is no lottery . . . .

In the United States, however, by what appears to be the weight of authority at the present day, it is not necessary that this element of chance be pure chance, but it may be accompanied by an element of calculation or even of certainty; it is sufficient if chance is the dominant or controlling factor. However, the rule that chance must be the dominant factor is to be taken in the qualitative or causative sense. [Footnotes omitted]

3 *Wharton's Criminal Law and Procedure* § 935 (Anderson ed. 1957).

The Delaware courts have not ruled on whether the "pure chance" or "dominant factor" rule applies in this State. Compare *State v. Sedgwick*, 81 A. 472, 473 (1911). The courts of two adjoining states considered this problem in the context of privately operated football pools and they concluded that the pools did fall within the meaning of lottery despite the presence of an element of skill. *State v. Steever*, 103 N.J.Super. 149, 246 A.2d 743 (1968). *Commonwealth v. Laniewski*, 173 Pa.Super. 245, 98 A.2d 215 (1953). In addition, over the last ten years the trend toward acceptance of the dominant factor rule described in *Wharton* has continued and expanded. See, e. g., *Morrow v. State*, 511 P.2d 127, 129 (Alaska 1973); *Finster v. Keller*, 18 Cal.App.3d 836, 96 Cal.Rptr. 241 (1971). Absent clear language in the Constitution supporting a contrary rule, I believe the Delaware Supreme Court would be inclined to adopt the majority, dominant factor rule.

Further support for the dominant factor rule can be found in the legislature's interpretation of the word lottery. The Delaware Constitution may be amended by a two-thirds vote of the General Assembly in two successive sessions with an intervening election. Del.Const., Art. XVI, § 1. The Amendment to Section 17 authorizing state lotteries was voted on favorably by the 126th General Assembly in 1972 and by the 127th General Assembly in 1973. The same Legislature that gave final approval to the constitutional amendment in its second session in 1974 established the State Lottery and State Lottery Office. 29 Del.C. § 4801, et seq. In doing so, it construed the term lottery broadly:

"Lottery" or "state lottery" or "system" shall mean the public gaming system or games established and operated pursuant to this chapter and including all types of lotteries.

\*　　\*　　\*　　\*　　\*　　\*

This broad legislative definition is significant because the Delaware courts subscribe to the rule of construction that when terms of the Constitution are ambiguous, the interpretation of the legislature is entitled to deference. In *State v. Hart*, 129 A. 691 (Del. Super.1925), the court commented:

If it was not clear from the Constitution when a vacancy shall be filled by election it would be not only proper but necessary to consider any law that would remove the uncertainty, but a statute may not be considered in construing a constitutional provision which is so clear and complete that there is no room for construction. Construction implies a precedent obscurity in the instrument on which it is brought to bear. Black on Interpretation of Laws, §§ 1 and 2.

Given the near contemporaneous approval of the lottery amendment and the lottery statute, application of this rule of construction is particularly appropriate in this instance.

In sum then, I conclude that the legislative interpretation of the term lottery

together with the weight of authority in other jurisdictions would persuade the Delaware Supreme Court that "lottery" should be interpreted to encompass not only games of pure chance but also games in which chance is the dominant determining factor."

I favor adoption of the "dominant factor rule" as suggested by Judge Stapleton. To apply the rule to the game of jai-alai, I rely upon the statistical analysis of the game derived by counsel from publications printed by the operators of Jai-alai frontons in Bridgeport, Milford, and Hartford, Connecticut, and which all counsel agree are correct. An analysis of player performance over a large number of games shows that no player or players has been able to establish a dominant winning percentage, and that the vast majority of players win approximately one-eighth of the games they play, i. e., the precise winning percentage that statistically should be achieved in a game of pure chance played by eight individuals. Thus, the performance statistics reveal that skillful players cannot dominate the game. An analysis of the wagering results of the general public also confirms the theory that chance is the dominant factor in jai-alai wagering. In a sample of over 6,000,000 bets during a one month period, researchers found that for each category of bet the public did no better selecting winners than they would have in a game governed by pure chance. A seven month analysis of win payoffs demonstrated that in over half of the games the public was able to pick the winners in numbers less than or equal to the amount which statistics show a person would be able to pick winners in a randomly determined game. From these facts I can reach no other rational conclusion than that pari-mutuel wagering on jai-alai contains the predominant element of chance controlling the recovery of a "prize" on the bettor's wager. I agree with, and would apply to jai-alai the Court's reasoning in *Commonwealth v. Laniewski*, supra, where wagering on football was examined to see if it constituted a "lottery" as follows:

It is true that for an avid student of the sport of football the chance taken is not as great as for those who have little interest in the game. However, it is common knowledge that the predictions even among the so-called "experts" are far from infallible. Any attempt to forecast the result of a single athletic contest, be it football or baseball, or whatever, is fraught with chance. . . . Past records, statistics and other data might be consulted, and, by reasoning from them, a forecast might be made as to the outcome of any particular game or games. However, there are many unpredictable elements which can and do enter into the eventual outcome. These elements—including the fact that at least twenty-two men are concerned in playing the game—constitute the chance which makes this particular pool a lottery. No one knows what may happen once the game has begun. In the words of Mr. Justice Holmes in *Dillingham v. McLaughlin*, 264 U.S. 370, 44 S.Ct. 362, 363, 68 L.Ed. 742: "What a man does not know and cannot find out is chance to him, and is recognized as chance by the law".

In the determination of whether or not pari-mutuel betting on jai-alai contains sufficient chance to qualify as a "lottery", I am of the opinion that we should not only recognize the chance element in the underlying sports event, but we must also view the chance element from the position of the bettor who is one step removed from the actual game, and who faces the variety of pari-mutuel pools in which he may place his money. Common sense alone dictates the conclusion that the multitudes attending the races or jai-alai do so to watch the sport, and to take their chances of coming away with more cash in their pockets than that with which they arrived. The odds on all of the pools change constantly with the ebb and tide of betting, until the bell rings marking the start of the contest. Play your money and take your chance, is the name of the game. Because chance is the dominating factor in the wagering on jai-alai, I conclude that the pari-mutuel system of betting on the jai-alai games as allowed by the Act constitutes a lottery.

Even were I not convinced that the Act contains all necessary elements traditionally associated with lotteries, I would still be of the opinion that the Act is a constitutional lottery because the activity permitted by the Act falls within the legislative definition of lottery. Undeniably the Jai-Alai Act is a public gaming system established pursuant to Title 29 of the Delaware Code, and, therefore, the Act is a lottery as defined in the State Lottery Act. See 29 *Del.C.* § 4803(b). As the majority state:

> "This action by the same General Assembly—the creation of a State-operated lottery—within a few months after it had completed the constitutional amendment creating the Lottery Exception, is the most persuasive indication we have as to the intent of the drafters in the use of the language . . . . In our opinion, the Lottery Exception [in Art. II, § 17(a)] and the implementing State Lottery Act were closely interrelated, the former being especially created, we believe, to enable the enactment of the latter."

It is reasonable to assume that the Legislature intended the term lottery to have the same meaning when they used it in the Lottery Amendment and the State Lottery Act. Therefore, because the Jai-Alai Act falls within the definition of lottery contained in the latter, it must also fall within the meaning of the word as used in the former law.

The majority opinion takes issue with the pronouncement of the Legislature, contained in the Act, that the Jai-Alai Act creates a constitutional lottery. According to the majority:

> "The pronouncement in the 1977 Act (§ 4820) that the pari-mutuel betting on jai-alai games there authorized 'is deemed by the General Assembly to be a lottery and permissible under the provisions of the Constitution of this State'. This statement merits deferential consideration, of course, as do all legislative pronouncements. But the interpretation of the Constitution is a judicial responsibility; and we may not accord to the 1977 statements of the drafters of the Act

determinative weight as we search for the intent of the drafters of the 1973 Revision of Art. II, § 17."

The majority implies that the 1977 Legislator's interpretation of the intent of the 1973 Legislators is incorrect. I submit that it is a correct interpretation, and point to the fact that thirty-four of the total number of sixty-one members of the General Assembly who consummated the lottery amendment, passed the State Lottery Act, and engineered, as the leaders of both houses of the present General Assembly, the passage of the Jai-Alai Act. I believe that the General Assembly has acted in accord with its intent as expressed in 1973.

It is within the power and discretion of the Legislature to define words in statutes as they see fit, even when the statutory definitions do not comport with previous statutory definitions, historical precedent or common usage. Where differing constructions of a word are possible, the Judiciary should accede to the interpretation adopted by the Legislature. The Supreme Court of Florida when dealing with a legislative enactment validating bingo in the face of an anti-lottery constitutional provision stated:

> "The situation then, as it presents itself in connection with our constitutional provision, is at least that by the decisions of the courts of Florida and other jurisdiction the word "lottery" may have either of several meanings, and that either is reasonable and possible. In such a situation, where a constitutional provision may well have either of several meanings, it is a fundamental rule of constitutional construction that, if the Legislature has by statute adopted one, its action in this respect is well-nigh, if not completely, controlling. As stated in *Fargo v. Powers* (D.C.), 220 F. 697, 709, it is said:
>
> > If the constitutional provisions in question are susceptible of two constructions—one being that contended for by complainants, the other that taken by the Legislature—the action of the Legislature in adopting one of those constructions and enacting a statute carrying it into effect, as thus con-

strued, must be deemed conclusive. That rule is: 'That the acts of a state Legislature are to be presumed constitutional until the contrary is shown; and it is only when they manifestly infringe some provision of the Constitution that they can be declared void for that reason. In case of doubt, every presumption, not clearly inconsistent with the language or subject-matter, is to be made in favor of the constitutionality of the act. The power of declaring laws unconstitutional should be exercised with extreme caution and never where serious doubt exists as to the conflict.' "

\* \* \* \* \* \*

When the Legislature has once construed the Constitution, for the courts then to place a different construction upon it means that they must declare void the action of the Legislature. It is no small matter for one branch of the government to annul the formal exercise by another of power committed to the latter. The courts should not and must not annul, as contrary to the Constitution, a statute passed by the Legislature, unless it can be said of the statute that it positively and certainly is opposed to the Constitution. This is elementary.

\* \* \* \* \* \*

We are not required to determine whether or not a particular factual situation, such as Bingo, is a lottery within the meaning of a statute prohibiting lotteries. This case involves a legislative construction of the term 'lottery,' as used in the Constitution.

\* \* \* \* \* \*

The Legislature, in its wisdom, has seen fit to permit this form of recreation for those unable to participate in the uncertainties of the authorized pari-mutuel pools, and, at the same time, has allowed worthy organizations to receive the benefits. We should abide by the will of the Legislature in the construction of the Constitution."

*Greater Loretta Imp. Assn. v. State Ex Rel Boone,* Fla.Supr., 234 So.2d 665 (1970).

In my opinion the definition of the word "lottery" found in 29 *Del.C.* Chapter 48 expresses the meaning and intent of the Legislature. The word is subject to differing construction, and that given by our Legislature must stand.

### B.

The majority also has decided that the gambling activity permitted under the Act would not be "under State control" as mandated by Art. II, § 17(a). With this legal conclusion I too must disagree. It is difficult to imagine a more rigid set of controlling regulations than those imposed upon the licensed operators of the jai-alai games by the Jai-Alai Act. The majority opines that in the absence of specific approval of control through licensing, state control must mean state operation. It is my view, that if the members of the General Assembly meant to require state operation they would have specifically said so. To infer otherwise is nothing more than judicial legislation. I am of the opinion that the regulations contained in the Jai-Alai Act reserve sufficient control in the State to meet the mandates of Article II, § 17.

\* \* \* \* \* \*

In my opinion the Jai-Alai Act creates a "lottery under state control", and is compatible with the dictates of Article II, § 17 of the Delaware Constitution.

### II

Question No. 3 asks:

Is Senate Bill 379 in violation of Art. VIII, § 2 of the Delaware Constitution which requires that all bills for raising revenue shall originate in the House of Representatives?

As all parties admit, the Jai-Alai Act will produce revenue for both the City of Wilmington and the State of Delaware. Indeed, *Del.Const.* Art. II, § 17(a) requires that an authorized lottery must be "for the purpose of raising funds". The majority logically concludes that the Jai-Alai Act

must, therefore, have originated in the House of Representatives as required by Delaware Constitution Article VIII, § 2, and because it did not,[3] the Act is unconstitutional. I disagree.

I am of the opinion that Senate Bill No. 379 is not a revenue raising act within the strictures of *Del.Const.* Art. VIII, § 2. The Act is not a direct tax on the citizens of this State, as the revenue raised comes from those who voluntarily participate in wagering at jai-alai meets. Compare *Opinion of the Justices,* Del.Supr., 233 A.2d 59 (1967). The constitutionally significant distinction is between a licensing law which incidently produces revenue, and a strictly taxing law. I believe the Jai-Alai Act is of the former variety, whereas the constitutional mandate requiring the House to pass revenue raising acts refers to the latter. See *Conrad v. State,* Del.Super., 16 A.2d 121 (1940), and *Yourison v. State,* Del.Super., 140 A. 691 (1928). The legal issue presented in the above-cited cases, whether a licensing act which raises revenue must be enacted in compliance with *Del.Const.* Art. VIII, § 2, is identical to the issue here. Therefore, I agree with the reasoning of *Yourison* and *Conrad,* and I am of the opinion that the Jai-Alai Act is not a revenue raising act within the dictates of Article VIII, § 2.

A similar issue as that raised by Question No. 3 was considered in *Opinion of the Justices,* supra, where the Governor sought an opinion on whether a Senate Bill providing for county vocational schools was unconstitutional under Article VIII, § 2. The Justices prefaced their consideration of whether the Bill was a revenue raised by saying:

> Before entering upon a discussion of the merits of the question, we note that disposition of the problem could be made

under the Enrolled Bill Doctrine. . . In an ordinary case, the fact that the subject Act was a Senate Bill would not be before us because irrelevant under the Enrolled Bill Doctrine. Since the Act was enacted and authenticated by the General Assembly and having been signed into law by the Governor, the regularity of the legislative action leading to the enactment ordinarily would be conclusively presumed. It is generally held under the Enrolled Bill Doctrine that evidence outside of a revenue act itself will not be admitted to impeach the act on the theory that it did not originate in the lower house . . ."

The Jai-Alai Act is similarly situated. Accordingly, pursuant to the Enrolled Bill Doctrine the validity of the Jai-Alai Act must be conclusively presumed as against any challenge based on its alleged origination in the Senate.

Both factually and legally I am of the opinion that the Jai-Alai Act does not contravene *Del.Const.* Art. VIII, § 2.

### III

In summary, I believe the Jai-Alai Act creates a system of wagering which contains all of the traditional elements of a lottery: prize, chance and consideration. The Act also creates a gaming system which falls within the legislative definition of a lottery, and the legislative determination must be viewed as presumptively correct. The Act grants sufficient regulatory controls over the gaming system to an agency of the State so that I conclude that the jai-alai gambling would be operated under "state control". Therefore, I am of the opinion that the Jai-Alai Act is a "lottery under state control" as permitted by

---

3. It is my understanding that the Jai-Alai Act did in fact have its origin in the House of Representatives. On July 12, 1977, the Delaware House sent a Jai-Alai Bill to the Governor. However, the Governor vetoed the bill, and subsequently the Senate drafted the presently contested bill. The Senate drafters relied on the House version for much of the language contained in the present law, but added a variety of regulatory provisions which were neces-

sary to meet the objections raised by the Governor to the original law. Whether the initiation of the idea of a Jai-Alai Act in the House is sufficient to constitute constitutional origin therein is a question to which none of the parties addressed themselves. Therefore, I shall assume, as has all parties, that under the facts surrounding the enactment of the Act, it originated in the Senate.

Article II, § 17 of the Delaware Constitution.

I am satisfied that the Jai-Alai Act is not a revenue raising act within the structures of Article VIII, § 2 of the Delaware Constitution.

\*     \*     \*     \*     \*     \*

For the previously stated reason, I respond to the Questions presented as follows:

Question No. 1: Affirmative
Question No. 2: Abstain
Question No. 3: Negative

Respectfully,

JOHN J. McNEILLY
Justice